

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Robert W. Gettleman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 7222 | **DATE** | Sept. 4, 2001 |
| **CASE TITLE** | Ronnie Evans    v    City of Chicago et al | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☒ Status hearing set for 10/18/01, at 9:00 a.m.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]    Memorandum opinion and order entered. Accordingly, defendants motion to dismiss is granted without prejudice to count 1, with prejudice to counts 2,3 & 4, and is denied as to count 5. Plaintiff is granted leave to file an amended complaint by 9/24/01. Defendants' response is due by 10/15/01.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | | |
|---|---|---|---|---|---|
| | No notices required. | | | number of notices | |
| X | Notices mailed by judge's staff. | | | SEP - 6 2001 | |
| | Notified counsel by telephone. | | | date docketed | |
| | Docketing to mail notices. | | | 15 | |
| | Mail AO 450 form. | | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | | |
| GDS | courtroom deputy's initials | | EG-7 FILED FOR DOCKETING 01 SEP -5 AM II: 41 | date mailed notice | |
| | | | Date/time received in central Clerk's Office | mailing deputy initials | |

Document Number

33

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| RONNIE EVANS, | ) | |
| | ) | DOCKETED<br>SEP ~ 6 2001 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF CHICAGO, and CHICAGO POLICE | ) | No.    00 C 7222 |
| OFFICERS JOSEPH McCARTHY, Star 7818, | ) | |
| ROBERT HOFER, Star 3860, | ) | Judge Robert W. Gettleman |
| R. BULLINGTON, Star 7577, MICHAEL | ) | |
| KOZENKO, Star 7577, J. HLADICK, Star | ) | |
| 18980, RICHARD COYLE, Star 13046, MARK | ) | |
| SMITH, Star 12935, and TONY GREEN, Star | ) | |
| 18670, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Ronnie Evans, has filed a five count complaint against the City of Chicago ("the City") and eight individual Chicago police officers (collectively "the Officers") alleging: racketeering activity against the Officers in violation of The Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§1961-1968 (Count I); §1983 malicious prosecution against the City and the Officers (Count II); a §1983 Monell claim against the City for failure to properly instruct, supervise, control and discipline the Officers (Count III); a state law claim for malicious prosecution against the City and the Officers (Count IV); and intentional infliction of emotional distress against the City and the Officers (Count V). The Officers have filed a motion

33

to dismiss plaintiff's complaint, which has been joined by the City.[1]  For the reasons set forth

below, defendants' motion to dismiss is granted in part and denied in part.

## FACTS

For purposes of a motion to dismiss, the court accepts the factual allegations of the

complaint as true and draws all reasonable inferences in favor of plaintiff.  Travel All Over the

World, Inc. v. Kingdom of Saudi Arabia, 73 F.3d 1423, 1428 (7th Cir. 1996).

The events in this case stem from the March 22, 1997, death of Frankie Ann Perkins

("Perkins").  According to plaintiff, Perkins, a 37 year-old mother of three, was lawfully walking

in her Chicago neighborhood when two Chicago police officers, Joseph McCarthy ("McCarthy")

and Robert Hofer ("Hofer"), stopped, searched and arrested Perkins without probable cause.

During the arrest, McCarthy and Hofer choked and physically abused Perkins and then watched

as she died from the injuries they inflicted, refusing to administer CPR or to allow paramedics

arriving on the scene to attempt to revive her.[2]  Plaintiff, a cousin of Perkins, allegedly witnessed

these events along with a man named Anthony Gray ("Gray").

---

[1] At the outset, the court denies plaintiff's motion to strike the Officers' reply brief.
Plaintiff is correct that neither the City's argument for the dismissal of Count III (reiterated by the
Officers in their reply brief), nor the Officers' assertions regarding the timeliness of Counts II, IV
and V, were included in the Officers' initial memorandum in support of the instant motion.  Even
so, the City's Count III argument was included in its motion to join the Officers' motion to
dismiss.  Likewise, the timeliness arguments regarding Counts II, IV and V were included in the
text of the Officers' motion, which was filed with their initial memorandum.  The court warns
the Officers' counsel against using this tactic in the future, however, as it could be misinterpreted
as a disingenuous method of making an argument to which a plaintiff is unlikely to respond.

[2] Based on these events, Perkins' estate filed a federal civil rights suit against the City in
April 1997.  The suit was later settled out of court; pursuant to the settlement agreement, the City
paid Perkins' estate $500,000.

2

Perkins' death received media attention and, on March 23, 1997, an interview of plaintiff naming McCarthy and Hofer as the perpetrators was broadcast on the evening news. Plaintiff also gave a statement to the Office of Professional Standards and to homicide investigators, again accusing McCarthy and Hofer.

Following these events, according to plaintiff, McCarthy, Hofer, and the other individual officers, R. Bullington ("Bullington"), Michael Kozenko ("Kozenko"), J. Hladick ("Hladick"), Richard Coyle ("Coyle"), Mark Smith ("Smith"), and Tony Green ("Green") harassed plaintiff for approximately three years. Plaintiff's complaint alleges that these individuals conspired together to intimidate, retaliate against, and discredit plaintiff and other witnesses. The acts carried out as part of the Officers' alleged conspiracy are set forth in detail below.

To begin, plaintiff alleges that two weeks after the television broadcast, McCarthy and Bullington came to plaintiff's house and threatened unspecified harm if he did not retract his statements to police and the media. Two days later McCarthy and Bullington returned, searched plaintiff, told him that they knew he was on probation at the time, and threatened to send him to jail if he did not retract his statements.

Sometime the next month, McCarthy, Bullington, Kozenko, and Coyle approached plaintiff in his backyard and ordered him to stand next to their police car and take off all of his clothes. The above officers then allegedly used their hands to spread the cheeks of plaintiff's buttocks apart, and shined a flashlight up his anus while laughing at plaintiff.

On May 12, 1997, McCarthy Bullington, Kozenko and Coyle went to plaintiff's home without a warrant or lawful justification, smashed open his back door and, with guns drawn, ordered plaintiff into his hallway. When plaintiff complied, one of the above officers struck

plaintiff, knocking him to the ground, and then the remaining officers continued beating plaintiff. Plaintiff was then taken to a police car and asked, "where is the other guy?" (referring to Gray). The Officers subsequently arrested Gray and Doris Jones ("Jones"), who had protested the treatment of plaintiff and Gray, and took all three to the 11th District headquarters of the Chicago Police Department ("the 11th District"). Upon arrival at the 11th District, the four officers continued to beat plaintiff, forced him to strip naked, and again searched his anus—this time in front of Jones. After that, officers McCarthy and Bullinton allegedly paraded plaintiff around the station, loudly exclaiming, "This is the guy who likes to go on TV. Whenever any of you see him, lock him up."

Although no controlled substances were found on plaintiff, Jones, or Gray, McCarthy and Bullington fabricated evidence and testimony to the contrary, resulting in felony possession of a controlled substance charges being brought against plaintiff. Officers Hofer and McCarthy later provided perjured testimony on the fabricated felony possession charge, in addition to the violation of probation charge that resulted therefrom.

After he was arrested on May 12, 1997, but apparently before he was incarcerated,[3] plaintiff was released from jail and placed under house arrest. Toward the end of May 1997, plaintiff asserts that officers McCarthy and Bullington came to his home and harassed him as he sat on his front porch. Another incident occurred on June 8, 1997, when Hladick and other officers from the 11th District approached plaintiff on the street, ordered him to put his hands on the police car, and then threatened plaintiff by saying that he (Hladick) "ought to whip

---

[3] Exactly when and why plaintiff was incarcerated is not clear to the court based on plaintiff's complaint. Plaintiff is urged to clear up this mystery in future filings.

[plaintiff's] ass." Plaintiff was then arrested without probable cause or lawful justification and again a possession charge was fabricated by the Officers. Despite Hladick's testimony at a probable cause hearing later that day, a finding of no probable cause was entered.

After plaintiff was released following the incident on June 8, 1997, Hladick drove to plaintiff's house, stopped his squad car in front, and used his loudspeaker to announce "Ronnie, we are coming back to get you." Then, in July 1997, Smith and Green arrested plaintiff without legal justification or probable cause. According to plaintiff he was again charged with felony possession of a controlled substance, and again the evidence against him was planted by the arresting officers. Although a judge threw out this charge on the basis of lack of probable cause, plaintiff alleges that the State, based on the false testimony of Green, obtained a grand jury indictment for the charge.

On September 21, 1997, again while plaintiff was out of jail, McCarthy and Bullington approached him in his neighborhood and, without probable cause or lawful justification, charged with him disorderly conduct, telling plaintiff he "had been a bad boy." Neither McCarthy nor Bullington appeared in court to testify in plaintiff's trial for disorderly conduct; the charge was consequently dismissed.

Plaintiff says that three other incidents occurred during that summer, though he cannot specify exactly when. In the first, Hofer and another officer approached plaintiff and interrogated him about some of the plaintiffs in the federal Civil Rights case brought on Perkins' behalf. The second and third times that plaintiff was approached by McCarthy and Bullington, they threatened to arrest plaintiff if he did not call the Office of Professional Standards and retract his statement that he saw McCarthy and Hofer strangle his cousin.

5

According to plaintiff, as a result of the initial charge of felony possession brought against him on May 12, 1997, plaintiff was incarcerated at the Cook County Jail for a total of 28 months. On March 17, 2000, the State moved to dismiss the possession charge *nolle prosequi*. Also, the State allegedly withdrew the violation of probation charge against plaintiff in October 1999. Plaintiff maintains his innocence with regard to all of the charges brought against him.

## LEGAL STANDARD

In ruling on a motion to dismiss for failure to state a claim, the court considers "whether relief is possible under any set of facts that could be established consistent with the allegations." Bartholet v. Reishauer A.G., 953 F.2d 1073, 1078 (7th Cir. 1992). A claim may be dismissed only if it is beyond doubt that under no set of facts would plaintiff's allegations entitle him to relief. Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Travel All Over the World, 73 F.3d at 1429-30. The purpose of a motion to dismiss is to test the sufficiency of the complaint, not to decide its merits. See Gibson v. City of Chicago, 910 F.2d 1510, 1520 (7th Cir. 1990).

## DISCUSSION

### I. COUNT I –RICO CLAIM AGAINST THE OFFICERS

After incorporating the above facts, plaintiff alleges in Count I that the Officers conspired together, through the enterprise of the Chicago Police Department, to: (1) commit acts or threats involving extortion as chargeable under Illinois law and punishable by imprisonment for more than one year; (2) obstruct justice in violation of 18 U.S.C. §1503; (3) obstruct a criminal investigation in violation of 18 U.S.C. §1510; (4) obstruct state or local law enforcement in violation of 18 U.S.C. §1511; (5) tamper with a witness, victim or informant in violation of 18 U.S.C. §1512; and (6) retaliate against a witness, victim or informant in violation of 18 U.S.C.

6

§1513. Plaintiff further alleges that as a direct and proximate result of the above racketeering activity, plaintiff has been injured in his business and property, including expending thousands of dollars in attorneys' fees to fight the false charges against him and thousands of dollars in lost wages during his 28 months of incarceration, as well as suffering damage to his reputation and future earning ability.

Defendants' attack on Count I is four-fold. First defendants argue that plaintiff lacks standing to bring a RICO claim against the Officers. Second, defendants assert that Count I fails to allege a RICO violation. Third, defendants argue that Count I fails to properly allege a criminal RICO enterprise. And, finally, defendants contend that Count I fails to allege a nexus with interstate commerce. The court will address each contention in turn.

## A. Plaintiff's Standing to Bring RICO Claim Against the Officers

RICO creates a civil cause of action for "any person injured in his business or property by reason of a violation of section 1962." Beck v. Prupis, 529 U.S. 494, 495 (2000) (quoting 18 U.S.C. §1964(c)). Relevant to the instant case are sections 1962(c) and (d).[4] Section 1962(c) makes it unlawful for

> any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

Section 1962(d), in turn, makes it unlawful for "any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

---

[4] Though not clearly identified in plaintiff's complaint, defendants admit that he "must be relying upon Section 1962(c), as well as Section 1962(d)."

Defendants contend that plaintiff has "failed to properly plead an injury to his business or property," as required by 18 U.S.C. §1964(c). According to defendants, plaintiff's injuries are personal injuries or pecuniary losses associated with personal injuries, not injuries to his business or property. Defendants also contend that plaintiff's injuries did not result directly from the alleged racketeering activity of the Officers. Based on these factors, defendants assert that plaintiff is without standing to sue under RICO. The court finds that while defendants are correct in certain respects, plaintiff has sufficiently pleaded an injury to his business or property and therefore has standing to sue the Officers.

In order to have standing in this civil RICO suit, plaintiff must allege that he sustained an injury to his business or property that was proximately caused by some act of the Officers that was an "act of racketeering or otherwise unlawful under [RICO]." Beck, 529 U.S. 494 at 507; see also Holmes v. Securities Investor Protection Corp., 503 U.S. 258, 266-68 (1992) (finding the proximate cause standard applicable; there must be "some relation between the injury asserted and the injurious conduct alleged"); Sedima, S.P.R.L. v. Imrex Co., Inc., 473 U.S. 479, 496 (1985) ("If the defendant engages in a pattern of racketeering activity in a manner forbidden by these provisions, and the racketeering activities injure the plaintiff in his business or property, the plaintiff has a claim under §1964(c).").

Defendants are correct that personal injuries are not injuries to plaintiff's business or property, even if those injuries result in an economic loss to plaintiff. Schiffels v. Kemper Fin. Servs., 978 F.2d 344, 353 (7th Cir. 1992) ("Schiffels I"), cert. denied, 114 S.Ct. 193 (1993). Examples of personal injuries include claims for embarrassment, humiliation, and emotional distress. Id. Defendants are also correct that injuries that are not proximately caused by the

8

Officers' unlawful conduct under RICO are too remote to confer standing upon plaintiff. <u>Beck</u>, 529 U.S. at 507; <u>see also</u> <u>Schiffels I</u> at 350-51 (providing examples of injuries not proximately caused by racketeering activity) ("A more graphic example would be where a group of people conspire to operate an arson-for-hire enterprise [and, w]hile driving to buy gasoline with which to start fires, one of the conspirators collides with and seriously damages another automobile.").

Plaintiff has alleged the following:

As a direct and proximate result of [the Officers'] racketeering violations . . . plaintiff . . . has been injured in his business and property, including expending thousands of dollars in attorney fees to fight the false charges against him, and thousands of dollars in lost wages during his 28 months [of] incarceration on false charges, and damage to his reputation and future earning capacity.

Following the guidelines above, the court finds that plaintiff's claims that he has suffered damage to his reputation and to his future earning capacity are not injuries to plaintiff's property or business proximately caused by the Officers' alleged racketeering conduct. Thus, plaintiff may not rely on these alleged injuries to establish his standing to sue the Officers under §1964(c) of RICO.

On the other hand, plaintiff's allegations that he lost thousands of dollars in wages while he was incarcerated and that he had to pay thousands of dollars in attorneys' fees as a result of the conspiracy are not personal or remote injuries; they are injuries to plaintiff's property that can be shown to have been proximately caused by the Officers' allegedly unlawful conduct. <u>See</u> <u>Mira v. Nuclear Measurements Corp.</u>, 107 F.3d 466, 474 (7th Cir. 1997) (equating appropriate injuries under RICO with "economic loss" that results from the defendants' conduct). As Judge Plunkett explained in <u>Schiffels v. Kemper Fin. Servs.</u>, 1993 U.S. Dist. LEXIS 6283, at *18, 1993 WL 153850 (N.D. Ill. May 10, 1993) ("<u>Schiffels II</u>"), "When assessing whether a purported

interest amounts to property, courts rely on state rather than federal law." (citing <u>Doe v. Roe</u>, 958 F.2d 763, 768 (7th Cir. 1992)). In Illinois, "property is 'anything of value.'" <u>Schiffels II</u> at *18. (quoting 720 ILCS §5/15-1, the criminal code definition of property in Illinois). Thus, plaintiff has alleged injuries to his property that are fairly traceable to the Officers' alleged unlawful conduct and, therefore, he has standing to sue them under §1964(c) of RICO.[5]

---

[5] Defendants misrepresent the holdings of many cases in their attempt to avoid this outcome. For instance, defendants cite <u>Doe</u> for the proposition that "mere allegations of financial losses, such as loss of earnings or attorneys' fees, does not constitute an injury to business or property sufficient to confer standing under the RICO Act." <u>Doe</u> leads to no such conclusion, however. <u>See</u> 958 F.2d 763.

As defendants well know (or should well know) from reading <u>Doe</u>, that case involved a (hopefully) rather unique fact pattern; the plaintiff in <u>Doe</u> filed suit against her previous attorney alleging that, in contravention of RICO, he fraudulently induced her into paying for his legal services with sexual favors. <u>Id.</u> In response to the defendant's contention that the plaintiff did not have standing because she lacked an injury to her business or property, the plaintiff argued that she sustained three types of property injuries. <u>Id.</u> at 768. First, she argued that the sexual labor she performed (and in exchange for which her debts were forgiven) constituted a property injury. <u>Id.</u> Second, she argued that she had to pay an inflated fee (in the form of sexual favors) to the defendant because he did not warn her that those services would be required. <u>Id.</u> And, finally, she argued that other miscellaneous expenses she incurred because of the defendant's actions were property injuries, including her lost earnings from missed work, the installation cost of her new home security system, and the cost she paid to hire a lawyer to sue the defendant. <u>Id.</u>

The court disagreed with each of plaintiff's arguments, finding that: (1) the performance of sexual favors lacks legal value and is therefore not "labor"; (2) the plaintiff did not give the defendant any money or property beyond the initial agreed retainer; and (3) plaintiff's missed work, her purchase of a security system, and her decision to hire a new attorney were all "plainly derivatives of her emotional distress—and therefore reflect personal injuries which are not compensable under RICO." <u>Id.</u> at 768-70. Thus, <u>Doe</u> does not support defendants' assertion that mere allegations of financial loss do not constitute a business or property injury sufficient to confer standing under RICO. Instead, <u>Doe</u> teaches that had the plaintiff suffered a *true* financial loss deriving from something other than her performance of sexual favors or emotional distress, she would have had standing under RICO.

Unlike the plaintiff in <u>Doe</u>, plaintiff in the instant case did not *choose* to miss work, to incur the expense of installing an alarm system in his house, or to hire an attorney to bring a civil suit for damages as a result of his emotional distress. Rather, plaintiff allegedly faced false felony criminal charges and was incarcerated for 28 months due to the Officers' unlawful conduct. Thus, plaintiff's lost wages and attorneys fees are not personal injuries because they resulted directly from the Officers' alleged racketeering activity.

## B. Plaintiff's RICO allegations

Defendants next argue that Count I of the complaint fails to allege a RICO violation because plaintiff has not properly alleged "a pattern of racketeering activity." According to defendants, "plaintiff alleges separate arrests by different officers, with no sufficient allegation that they are connected." Further, defendants contend that plaintiff has "failed to sufficiently allege the temporal relationship between the agreement and the arrests, so that there is no sufficient allegation that each of the Officers other than McCarthy and Hofer even knew about the alleged scheme to commit the predicate acts at the time that McCarthy and Hofer hatched the scheme." Defendants also claim that "although plaintiff alleges a laundry list of criminal conduct which can be predicate acts, plaintiff fails to allege which officer committed which criminal conduct constituting which predicate act." Defendants' arguments are unsupported by prevailing case law.

"A pattern of racketeering activity consists, at a minimum, of two predicate acts of racketeering committed within a ten-year time period." Goren v. New Vision Int'l, Inc., 156 F.3d 721, 728 (7th Cir. 1998). "Conclusory allegations of 'conspiracy' are not sufficient to state a claim under §1962(d); rather [plaintiff] must allege facts from which one can infer each defendant's agreement to violate §1962(c)." Schiffels I at 352 (citations omitted). Even so, a "RICO conspiracy, like all conspiracies, does not require direct evidence of agreement; an agreement can be inferred from the circumstances." Gagen v. American Cablevision Inc., 77 F.3d 951, 961 (7th Cir. 1996). Moreover, RICO conspiracy liability is broad enough to reach those involved in the conspiracy who did not participate in the commission of the predicate offenses and did not agree to do so. See id.; United States v. Neapolitan, 791 F.2d 489, 498 (7th

11

Cir. 1986). Finally, the determination of what role the Officers each played in the conspiracy is a question of fact. United States v. Golden, 954 F.2d 1413, 1418 (7th Cir. 1992) (citation omitted).

Plaintiff's complaint alleges that the Officers conspired as follows:

> Officers Hofer and McCarthy . . . agreed and conspired together, and with other officers in the [11th District], to form a plan to intimidate, retaliate against, and discredit [plaintiff] and other witnesses. This plan included threats, which, if not successful, would be followed up by beatings, harassment, arrest, and prosecution. As part of this conspiracy to intimidate witnesses, Hofer and McCarthy enlisted the aid and support of other [11th District] and Special Operations Section Chicago Police officers, including Officers Bullington, Hladick, Kozenko, Coyle, Smith and Green, and others unnamed.

Additionally, as set forth at the outset of this opinion, plaintiff's complaint alleges twelve separate incidents in which one or more of the Officers took an action that was "further part of the conspiracy." Notably, each of the Officers is alleged to have participated in at least one of these acts, and all but Smith participated in at least two. Also, based on the facts, the alleged harassment of plaintiff by the Officers followed his statement to the media and continued through his incarceration pending trial on the allegedly false charges brought against him.

Based on this, defendants' allegation that plaintiff failed to connect all of these incidents together is without merit. Likewise, defendants' claim that plaintiff did not allege a "temporal relationship between the agreement and the arrests" also fails; assuming such a requirement

exists,[6] the timing of the agreement between the Officers and their arrests of plaintiff is obvious from the facts alleged. Further, the court finds no basis for defendants' assertion that plaintiff has failed to allege "which officer committed which criminal conduct constituting which predicate act," because the complaint identifies the officers involved in each alleged incident.[7] Thus, the court disagrees with defendants' unsupported conclusion that "plaintiff has simply strung together a series of independent arrests and characterized them as a pattern of racketeering activity" which is "insufficient to state a violation of Section 1962(c) or (d)."[8]

---

[6] Defendants apparently divine this requirement from the Seventh Circuit's comment in Schiffels I that the plaintiff's complaint was "very vague about the temporal relationship" between the scheme of the defendant who violated RICO initially and the alleged agreement of the defendants who later tried to cover up that RICO violation. Id. at 352-53. Unlike the instant case, the temporal relationship between the agreement and alleged acts in furtherance thereof was an issue in Schiffels I because the charged RICO violation had ended by the time the other defendants entered the picture and began the coverup. Id. As the court explained, "A conspiracy to cover up a past RICO violation is not necessarily a conspiracy to violate RICO, because the conspiracy to cover up does not necessarily include an agreement to the commission of a pattern of predicate acts." Id. at 352. Defendants' representation of the above quote as showing that, "The court noted that the allegations of a conspiracy to cover up past conduct did not translate into a conspiracy to commit a pattern of predicate acts," is misleading at best.

[7] If what defendants seek is a more specific description of exactly what each officer allegedly said and did to plaintiff during each incident, they can seek that information during discovery. The facts alleged in plaintiff's complaint satisfy the notice pleading requirement of Federal Rule of Civil Procedure 8.

[8] Apparently in an attempt to scare the court, defendants claim that, if the court denies their motion on this basis, then "Every drug dealer, every career criminal, could allege a RICO claim." That is true, at least to the extent that the drug dealers and career criminals to which defendants refer make sufficient allegations under RICO to satisfy the notice pleading standards and the obligations under Federal Rule of Civil Procedure 11. There is a big difference between properly alleging a RICO claim and providing evidence for all the necessary requirements under RICO, however. At this stage, of course, the court need not concern itself with the question of whether plaintiff can substantiate his allegations.

### C. Plaintiff's allegations of a RICO enterprise

Defendants' next contention is that Count I fails to allege a proper criminal RICO enterprise. According to defendants, plaintiff's complaint "does not contain any allegations to show that [the Officers] conducted the affairs of the Chicago Police Department through a pattern of racketeering activity." In addition, defendants contend that plaintiff's enterprise allegations are deficient because the Officers are "beat officers" who cannot conduct or control the affairs of the Chicago Police Department, which is controlled by a separate chain of command. The court finds both arguments unpersuasive.

A RICO enterprise is defined as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. §1961(4). Both governmental and public entities fit within the definition of "enterprise." United States v. Kovic, 684 F.2d 512, 516 (7th Cir. 1982), cert. denied, 459 U.S. 972 (citing United States v. Grzywacz, 603 F.2d 682 (7th Cir. 1979), cert. denied, 466 U.S. 935 (1980); United States v. Lee Stoller Enterprises, Inc., 652 F.2d 1313 (7th Cir. 1981)). Indeed, the Chicago Police Department has been held to be a RICO enterprise in the past. See Kovic, 684 F.2d at 516-17; United States v. Ambrose, 740 F.2d 505, 512 (7th Cir. 1984). In addition, with respect to the language of RICO §1962(c), which forbids "conduct of [an] enterprise's affairs through a pattern of racketeering activity," the term "through" has been interpreted by the Seventh Circuit to mean "by means of, in consequence of, by reason of." Kovic, 684 F.2d at 517 (citing United States v. Nerone, 563 F.2d 836, at 851 (7th Cir. 1977), cert. denied 435 U.S. 951 (1978)).

Thus, the Officers need not have supervisory power within the Chicago Police Department in order to conduct its affairs by means of, in consequence of, or by reason of the alleged pattern of racketeering activity. <u>Kovic</u>, 684 F.2d at 516-17 (noting that the relevant inquiry is whether the defendant used his position to carry out the alleged racketeering activity); <u>Ambrose</u>, 740 F.2d at 512 (rejecting the defendants' argument that they could not be guilty because they did not have a supervisory position in the Chicago Police Department). As the Supreme Court recently explained, "RICO . . . protects the public from those who would unlawfully use an enterprise (whether legitimate or illegitimate) as a vehicle through which unlawful . . . activity is committed." <u>Cedric Kushner Promotions, Ltd. v. King</u>, 150 L. Ed. 2d 198, 205 (U.S. 2001) (internal quotations and citation omitted).

Plaintiff has alleged that the Officers

> conduct[ed] the affairs of an enterprise, the Chicago Police Department, through a pattern of racketeering activity against the plaintiff, including beatings, threats, strip searches, false arrests, evidence planting, perjury, and malicious prosecution, in order to obstruct justice, and intimidate and retaliate against a witness in a death investigation and related federal civil suit.

Also clear from the allegations in the complaint is the fact that nearly all of the alleged acts committed in furtherance of the asserted conspiracy depended on the Officers' possession of police powers. Without such power, the Officers would not have been able to threaten to arrest plaintiff, to strip search him, to arrest him, to plant evidence on him, and to testify falsely against him as they allegedly did.

Based on these allegations, the court disagrees with defendants' contention that plaintiff has failed to allege that the Officers conducted the affairs of the enterprise through a pattern of racketeering activity. Similarly, it does not matter that the Officers were merely "beat officers"

who cannot conduct or control the affairs of the Chicago Police Department. The court finds that the complaint sufficiently alleges that the Officers used the Chicago Police Department as a vehicle through which they could carry out their agreement to intimidate and retaliate against plaintiff, a witness against two of the Officers in a death investigation and related federal civil suit.

### D. Plaintiff's allegations of a nexus with interstate commerce

Finally, defendants argue that Count I must be dismissed for failure to assert jurisdiction because it is void of any allegation that the enterprise in the instant case sufficiently affects interstate commerce. Plaintiff admits that there is no explicit allegation regarding interstate commerce in the complaint, but urges the court to deem the pleading requirement satisfied by plaintiff's assertion in his response brief that "the Chicago Police Department most assuredly supplies the interstate commerce nexus."

"[T]o state a claim under §1962, plaintiff [must] allege . . . the existence of an enterprise affecting interstate commerce." Williams Electronics Games, Inc. v. Barry, 42 F. Supp. 2d 785, 790 (N.D. Ill. 1999). The Seventh Circuit has held that the "required nexus between the activities of the enterprise and interstate commerce need not be great; even a minimal effect on interstate commerce satisfies this jurisdictional element." United States v. Muskovsky, 863 F.2d 1319, 1325 (7th Cir. 1988) (internal quotation and citation omitted). Following this standard, past cases have found the required nexus where the enterprise purchased supplies and office equipment from companies located outside Illinois, even though the supplies and office equipment were not shown to be used by, or central to, the Illinois racketeering activity charged.

See e.g., United States v. Murphy, 768 F.2d 1518, 1531 (7th Cir. 1985), cert. denied, 475 U.S. 1012 (1986); United States v. Conn, 769 F.2d 420, 423-24 (7th Cir. 1985).

Given this meager standard, plaintiff will likely establish that the Chicago Police Department supplies the interstate commerce nexus under §1962(c). The question remains, however, whether the court can read the required interstate commerce element of plaintiff's claim into his complaint, which is silent on the issue. Because plaintiff has not provided, and the court has not found, any case law justifying such an action,[9] the court grants defendants' motion to dismiss Count I without prejudice. Plaintiff is given leave to file an amended claim that includes an allegation satisfying the interstate commerce requirement of §1962(c).

## II. COUNT II –FEDERAL MALICIOUS PROSECUTION CLAIM AGAINST THE OFFICERS

Defendants' argument with respect to Count II, labeled by plaintiff "1983 Malicious Prosecution, 4th and 14th Amendment Violations," is quickly addressed. Defendants have provided the court with a recent Seventh Circuit decision which makes clear that "the existence of a tort claim [for malicious prosecution] under state law knocks out any constitutional theory of malicious prosecution." Newsome v. McCabe, ___ F.3d ___, 2001 WL 771023, *2, 2001 U.S. App. LEXIS 15520 (7th Cir. July 11, 2001). Thus, because plaintiff alleges a state claim under a theory of malicious prosecution in Count IV, Count II must be dismissed.[10] See id.

---

[9] The court could use plaintiff's brief to clarify allegations in his complaint, Pegram v. Herdrich, 530 U.S. 211, 230 n.10 (2000), but there is no allegation to clarify in this instance.

[10] The court notes that plaintiff's title, "1983 Malicious Prosecution, 4th and 14th Amendment Violations," could be interpreted to allege a malicious prosecution claim under 42 U.S.C. §1983 and a Fourth Amendment false arrest claim. Based on plaintiff's complaint and brief submitted in response to the instant motion, however, it is clear that plaintiff intended to plead malicious prosecution in Count II.

### III. COUNT III–§1983 CLAIM AGAINST THE CITY FOR FAILURE TO PROPERLY INSTRUCT, SUPERVISE, CONTROL AND DISCIPLINE THE OFFICERS

The City's argument with respect to Count III is also quickly addressed. According to the City, if Count II is dismissed, Count III must also be dismissed because the City's liability for Count III "hinges, in part, on whether [the Officers] committed an underlying constitutional wrong against plaintiff." Thus, the argument goes, if plaintiff cannot state a claim for a constitutional wrong, he cannot state a Monell[11] claim. The court agrees. See Thompson v. Boggs, 33 F.3d 847, 859 (7th Cir. 1994), cert. denied, 115 S. Ct. 1692 (1995) (citing Los Angeles v. Heller, 475 U.S. 796, 799 (1986) (per curiam)); Haynes v. City of Chicago, 1996 U.S. Dist. LEXIS 5294, *12, 96 WL 197675 (N.D. Ill. Apr. 17, 1996) ("Having found [that plaintiff] failed to state a fourteenth amendment due process claim against the [defendant] police, [plaintiff] cannot prevail on his Monell claim against the village."). Thus, Count III is dismissed.

### IV. COUNT IV –STATE MALICIOUS PROSECUTION CLAIM AGAINST THE OFFICERS

Plaintiff alleges in Count IV that, through their participation in the conspiracy described above, the Officers "sought to and did in fact maliciously prosecute [plaintiff] on false charges for which there was no probable cause, including felony controlled substance charges from the May 12, 1997 arrest . . . which charges were resolved in plaintiff's favor indicative of his innocence by a State motion to nolle prosse the charges on March 17, 2000." Plaintiff further asserts that the Officers offered "ongoing false and perjured testimony in order to keep [plaintiff] incarcerated on the false controlled substance charges," and that they "proceeded with the

---

[11]In Monell v. New York City Dept. of Social Services, 436 U.S. 658, 713 (1978), the Supreme Court held that local governments can be sued under §1983 when an unconstitutional action of its employee is shown to result from a government policy, practice or custom.

charges against . . . plaintiff knowing they were false."[12] Next, plaintiff asserts that the City is

liable for Count IV under the *respondeat superior* theory "in that defendant officers performed

the actions complained of while on duty and in the employ of [the City], and while acting within

the scope of this employment." Finally, plaintiff alleges that, "as a direct and proximate result of

these Constitutional violations, [plaintiff] was damaged, including the value of his liberty for 28

months of incarceration, lost wages, attorneys fees, pain and suffering, and mental and emotional

suffering and anguish."

Defendants wage a number of attacks on Count IV. First, they argue that plaintiff cannot

seek redress through a malicious prosecution claim for any of his arrests because his claims are

time-barred and because none of the arrests were terminated in plaintiff's favor as required by

Illinois law. The court agrees with defendants' arguments with respect to three of plaintiff's

arrests and one other charge, but not his arrest on May 12, 1997.

---

[12] Defendants cite <u>Briscoe v. Lahue</u>, 460 U.S. 325 (1983), for the proposition that "police officers are immune from claims of false testimony." In fact, <u>Briscoe</u> held that police officers, like all other witnesses, are immune from civil liability under §1983 for their testimony at trial. The Seventh Circuit expanded this absolute immunity to include witnesses' testimony in pretrial proceedings, such as motions or preliminary hearings, in <u>Curtis v. Bembenek</u>, 48 F.3d 281, 285 (7th Cir. 1995). "One exception to this 'wall of immunity' for trial and pretrial testimony," however, "is for a 'complaining witness.'" <u>Pierce v. Pawelski</u>, 2000 U.S. Dist. LEXIS 18229, *14, 2000 WL 1847778 (N.D. Ill. Dec. 11, 2000) (quoting <u>Cervantes v. Jones</u>, 188 F.3d 805, 809 (7th Cir. 1999), <u>cert. denied</u>, 120 S. Ct. 1159 (2000)).

The Officers in the instant case may very well be found to be complaining witnesses. <u>See</u> <u>Pierce</u>, 2000 U.S. Dist. LEXIS 18229 at *14 (explaining that a "witness['s] status as a complaining witness is a question of fact") (citing <u>Cervantes</u>, 188 F.3d at 810 n.5); <u>cf</u>. <u>Pierce</u>, 2000 U.S. Dist. LEXIS 18229 at *16 (holding that the plaintiff's allegations that the defendant police officers "provided the information by which the State's Attorney criminally charged Pierce, fabricated false evidence to inculpate Pierce, generated police documents that falsely reported incriminating facts about Pierce, and testified falsely at Pierce's trial," could "lead the trier of fact to conclude that defendants actively instigated and encouraged the prosecution of Pierce," making them complaining witnesses). Thus, plaintiff may be able to use the Officers' allegedly false testimony against them after all.

To state a claim for malicious prosecution under Illinois law, plaintiff must allege: (1) that he was subjected to judicial proceedings; (2) for which there was no probable cause; (3) the Officers instituted the proceedings maliciously; (4) the proceedings were terminated in plaintiff's favor; and (5) there was an injury. Curtis, 48 F.3d at 286 (citing Heck v. Humphrey, 114 S. Ct. 2364, 2371 (1994)).

The parties agree that plaintiff's arrest on May 12, 1997, which resulted in plaintiff being charged with possession of a controlled substance, was resolved by the State's motion to *nolle prosequi* the charges on March 17, 2000. This date is relevant to defendants' contention that Count IV should be dismissed because plaintiff's claims are barred by the applicable one-year statute of limitations under the Illinois Local Governmental and Governmental Employees Tort Immunity Act, 745 ILCS 10/8-101. Section 8-101 of that act states: "No civil action may be commenced in any court against a local entity or any of its employees for any injury unless it is commenced within one year from the date that the injury was received or the cause of action accrued."

As the court has explained in past cases dealing with state law malicious prosecution claims, because plaintiff must plead that the judicial proceedings were terminated in his favor in order to state a claim for malicious prosecution, his claim does not accrue until the judicial proceedings are terminated. See Cozzi v. Pepsi-Cola Gen. Bottlers, 1997 U.S. Dist. LEXIS 21130, *11-21, 1997 WL 811687 (N.D. Ill. Dec. 22, 1997) (Gettleman, J.) (citing and discussing Illinois cases supporting the above conclusion); see also Robinson v. City of Harvey, 1999 U.S. Dist. LEXIS 12478, *6-7, 1999 WL 617655 (N.D. Ill. Aug. 10, 1999) (denying motion to dismiss state law claim for malicious prosecution); Burge v. Harvey Police Officers, 1997 WL 610045, at

*2, 1997 U.S. Dist. LEXIS 15248 (N.D.Ill. Sept. 25, 1997) (same). The court therefore finds that plaintiff's malicious prosecution claim premised on his arrest on May 12, 1997, did not accrue until March 17, 2000. Thus, because plaintiff filed the instant lawsuit on November 16, 2000 (just shy of eight months after the felony possession charges against him were dismissed), the court deems Count IV timely.

The court grants defendants' motion with prejudice with respect to plaintiff's arrests on June 8, 1997, and July 14, 1997, however, because plaintiff concedes that the charges that followed these arrests were not terminated in his favor.[13] Plaintiff admits that he plead guilty to the charges that followed the former arrest and was found guilty of the charges that resulted from the latter arrest. Bontkowski v. United States, 28 F.3d 36, 37 (7th Cir. 1994) ("A prosecution ending in a guilty plea does not end in a manner "indicative of Plaintiff's innocence.").

Likewise, defendants' motion is granted with prejudice with regard to the charge of disorderly conduct brought against plaintiff following his arrest on September 21, 1997. This charge was "SOL'd" on November 10, 1997, and therefore plaintiff's claim with regard to this arrest accrued on that day. Accordingly, even assuming that having this charge "SOL'd" is

---

[13] Plaintiff's actual statement is that, although the outcomes of his June and July arrests "may remove these two prosecutions from attack under Illinois malicious prosecution law, plaintiff intends to prove at trial, as part of the overall conspiracy charges, that all the arrests were based on false evidence and that he was innocent of all charges." Plaintiff cannot argue his innocence with respect to valid convictions, however, because "by operation of the doctrine of collateral estoppel, a valid criminal conviction acts as a bar to overturning that conviction in a civil damages suit." Levine v. Kling, 123 F.3d 580, 583 (7th Cir. 1997) (citing Appley v. West, 832 F.2d 1021, 1025-26 (7th Cir. 1987); Scherer v. Balkema, 840 F.2d 437, 442 (7th Cir. 1988); Restatement (Second) of Judgments, §85(2)(a) and comment e (1982)); see also Heck v. Humphrey, 512 U.S. 477, 478-490 (1998). Thus, should the instant case go to trial, plaintiff will be estopped from arguing his innocence with regard to the charges stemming from his arrests on June 8, 1997, and July 14, 1997, unless those convictions are somehow overturned in the meantime.

indicative of plaintiff's innocence,[14] his claim is still time-barred because he did not file the instant suit until November 16, 2000.

And finally there is plaintiff's alleged charge of probation violation stemming from his arrest on May 12, 1997. According to plaintiff, "the State withdrew" these charges "on or about October, 1999." Depending on what is meant by "withdrew," however, plaintiff may or may not be able to show that this charge was terminated in his favor. Further, recalling that plaintiff filed the instant suit on November 16, 2000, plaintiff's claim with respect to this charge appears to be time-barred. Thus, the court grants defendants' motion to dismiss this portion of Count IV without prejudice; if, upon closer inspection, plaintiff finds that he can allege in good faith that this charge was terminated in his favor after November 16, 1999, plaintiff should do so in his amended complaint.

There are still a few questions left unanswered, however. The first is whether the *nolle prosequi* dismissal of the charges brought against plaintiff following his arrest on May 12, 1997, is a termination in plaintiff's favor; defendants argue that it is not, while plaintiff argues that it is. The Illinois Supreme Court offered courts and litigants guidance in answering this question in Swick v. Liautaud, 662 N.E.2d 1238 (Ill. 1996), and later confirmed that reasoning in Cult Awareness Network v. Church of Scientology, Int'l, 685 N.E.2d 1347 (Ill. 1997). The court explained that "a *nolle prosqui* may serve as a favorable termination unless the prosecution was abandoned for reasons not indicative of the innocence of the accused." Cult Awareness, 685

---

[14] In most instances it is not. As Judge Anderson explained, "an SOL is not a legal termination in favor of the accused for purposes of a malicious prosecution claim[; r]ather, the effect of striking a cause from the docket is that it cannot be tried until it is again placed on the docket." Adenekan v. Chicago Police Officers, 1996 U.S. Dist. LEXIS 19271, *7-8, 1996 WL 734705 (N.D. Ill. Dec. 19, 1996) (internal quotations and citations omitted).

N.E.2d at 1354 (citing <u>Swick</u>, 622 N.E.2d at 1242-43). In so holding, the court "stressed that it was the circumstances surrounding the entry of the *nolle prosequi* that must be examined and not the mere form or title of the disposition." <u>Cult Awareness</u>, 685 N.E.2d at 1354 (citing <u>Swick</u>, 622 N.E.2d at 1242-43). "The abandonment of the proceedings is not indicative of the innocence of the accused when the *nolle prosequi* is the result of an agreement or compromise with the accused, misconduct on the part of the accused for the purpose of preventing trial, mercy requested or accepted by the accused, the institution of new criminal proceedings, or the impossibility or impracticability of bringing the accused to trial." <u>Swick</u>, 622 N.E.2d at 1242.

Defendants argue that "there is no indication in the Complaint, or in the public record, that the *nolle prosse* disposition of the May 12, 1997 arrest is indicative of innocence." Instead, defendants assert, the opposite is indicated by the fact that on March 7, 2000, the day the *nolle prosequi* was entered, plaintiff plead guilty to the charges stemming from his arrest on June 8, 1997, and was found guilty of the charges stemming from his arrest on July 12, 1997. In response, plaintiff argues that he has alleged that he is innocent of the charges stemming from his arrest on May 12, 1997, and he has alleged that the *nolle prosequi* is indicative of his innocence, and these allegations are sufficient at this early stage of the litigation. The court agrees.

While it is true that at the summary judgment stage and beyond, the "bare use of a *nolle prosequi* order does not establish that the criminal proceedings were terminated in a manner indicative of the plaintiff's innocence," the parties have not reached that stage in the instant case. <u>Logan v. Caterpillar, Inc.</u>, 246 F.3d 912, 924-26 (7th Cir. 2001); <u>see also</u> <u>Washington v. Summerville</u>, 127 F.3d 552, 557-58 (7th Cir. 1997). In deciding the instant motion, the court cannot weigh the facts—the court must assume that plaintiff's allegations are true. Defendants

would have the court make a finding of fact or, at least, an inference based on how other charges against plaintiff were resolved the same day that the *nolle prosequi* was entered. This is not the exploration of the circumstances surrounding the entry of the *nolle prosequi* that the Illinois Supreme Court envisioned when it decided <u>Cult Awareness</u> and <u>Swick</u>. At this point it is sufficient for the court to find that it is possible for plaintiff to prove facts that establish his allegation that the "charges were resolved in plaintiff's favor indicative of his innocence by a State motion to nolle prosse." Thus, the court denies defendants' motion to dismiss on this basis.

Next, defendants argue that not all of the Officers should be held accountable under Count IV because plaintiff does not allege sufficient facts to show that all of them participated in plaintiff's alleged malicious prosecution. Specifically, defendants argue that plaintiff's "specific factual allegations do not support any malicious prosecution claim against Officers Kozenko and Coyle" because plaintiff has not alleged that either of these officers brought false charges against him. Plaintiff's response to this argument is that under Illinois law, "a civil conspiracy claim has the effect of tying the actions of the defendants together." So, plaintiff's theory goes, because Kozenko and Coyle participated in the conspiracy, they are accountable for the actions of the other officers which he contends constitute malicious prosecution (including arresting plaintiff without probable cause, planting evidence on him, and testifying falsely against him). Plaintiff also notes that "it is common knowledge that all arresting officers sign off on the arrest report, which is an integral part of a state prosecution."

Having decided that plaintiff's malicious prosecution claim can be based only on his arrest on May 12, 1997, and because Kozenko and Coyle are both alleged to have participated in the events surrounding that arrest and in the conspiracy generally, the court finds sufficient

24

support for allowing plaintiff to pursue his malicious prosecution claim against them. Thus, the court denies defendants' request that these officers be dismissed from Count IV.

## V.  COUNT V –INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM AGAINST THE CITY AND THE OFFICERS

In Count V, plaintiff alleges that the incidents of harassment outlined above show that the Officers' conduct "was extreme and outrageous, exceeding all bounds of human decency." Further, plaintiff claims that the Officers "performed the acts detailed above with the intent of inflicting severe emotional distress or with knowledge of the high probability that the conduct would cause such distress." As "a direct and proximate result of this conduct," plaintiff alleges that he "did in fact suffer severe emotional distress, resulting in injury to his mind, body, and nervous system, including loss of sleep, mental anguish, nightmares, and flashbacks." Finally, plaintiff states that the City is sued in Count V "pursuant to the doctrine of respondent [sic] superior, in that defendant officers performed the actions complained of while on duty and in the employ of [the City] . . . , and while acting within the scope of this employment."

Defendants offer three main reasons why plaintiff's state law claim for intentional infliction of emotional distress ("IIED") should be dismissed. First, defendants argue that plaintiff has failed to show that each of the Officers committed acts that constitute IIED under Illinois law. Specifically, defendants contend that the complaint fails to allege an IIED claim against officer Hladick because his threat to plaintiff "does not constitute [IIED] and there is nothing to connect his conduct to any other Officer's conduct." Defendants further contend that "there are no allegations that Officers Green or Smith made any threats to plaintiff, committed any excessive force, or did any act other than arrest plaintiff." Finally, defendants assert that the

complaint "does not allege that Officer Hofer participated in any of the threats to plaintiff or any excessive force against plaintiff." Thus, defendants seek to have officers Hladick, Green, Smith and Hofer dismissed from Count V because their conduct cannot be considered outrageous.

Defendants confuse their motion to dismiss for a motion on the merits of plaintiff's suit. Illinois law requires plaintiff to allege the following elements of an IIED claim: "(1) the [Officers'] conduct was extreme and outrageous; (2) the [Officers] intended to inflict severe emotional distress or knew there was a high probability that the conduct would cause such distress; and (3) the [Officers'] conduct did, in fact, cause severe emotional distress." Treece v. Village of Naperville, 903 F. Supp. 1251, 1259 (N.D. Ill. 1995) (citing Doe v. Calumet City, 641 N.E.2d 498, 506 (Ill. 1994)). Plaintiff has done this; he has alleged that the conduct of officers Hladick, Green, Smith and Hofer "was extreme and outrageous, exceeding all bounds of human decency." Further, as explained in conjunction with Count I, plaintiff has alleged twelve separate incidents when one or more of the Officers took an action that was "further part of the conspiracy." These actions included threatening plaintiff, making him take off his clothes in public and searching his anus, humiliating him through other means, beating him, arresting him without probable cause, charging him with crimes he did not commit, and testifying falsely against him to keep him incarcerated. Each of the Officers is alleged to have participated in at least one of these acts, and all but Smith participated in at least two. Further, plaintiff has alleged that the Officers performed the above acts without probable cause or legal justification. See Treece, 903 F. Supp. at 1260 (rejecting the same argument in part because the defendant officers allegedly abused their positions of power). Thus, the court finds plaintiff's allegations sufficient to state a claim for IIED against Hladick, Green, Smith and Hofer.

Defendants' second argument is that Count V "is devoid of any allegation which shows intent on the part of each of the Officers." The court rejects this argument because it is plainly contradicted by the text of the complaint, which states that the Officers "performed the acts detailed above with the intent of inflicting severe emotional distress or with knowledge of the high probability that the conduct would cause such distress."

Defendants' third contention is that plaintiff's IIED claim is time-barred by the same statute that barred several of plaintiff's potential claims in Count IV. See 745 ILCS 10/8-101. The court disagrees. Plaintiff's IIED claim incorporates the same conduct of the Officers that supports his remaining malicious prosecution claim. Thus, as with plaintiff's malicious prosecution claim, "the clock did not start running on plaintiff's intentional infliction of emotional distress claim until the state criminal proceedings were terminated." Treece, 903 F. Supp. at 1259; see also Santiago v. Marquez, 1998 U.S. Dist. LEXIS 4565, *11, 1998 WL 160878 (N.D. Ill. Mar. 30, 1998) (following Treece and finding that the plaintiff's IIED claim did not accrue until the state criminal proceedings were terminated in the plaintiff's favor, because the IIED claim "realleges not only the wrongful arrest and beating but all of the events by which the Police Defendants sought to cover up the beating up to and including the false charges and the malicious prosecution"); Pierce, 2000 U.S. Dist. LEXIS 18229 at *9 (following Santiago and concluding that because "[the plaintiff's] IIED claim is based not just on the events occurring on the day of his arrest, but on defendants' participation in his wrongful prosecution and their allegedly false testimony at his trial," the plaintiff's "IIED claim did not accrue until Pierce's [acquittal]"). Consequently, because plaintiff's IIED claim accrued on March 17, 2000, and he filed suit on November 16, 2000, his IIED claim is timely.

## CONCLUSION

Defendants' motion to dismiss is granted without prejudice with respect to Count I; plaintiff is given leave to file an amended complaint that alleges a nexus to interstate commerce as required under RICO §1962(c) on or before September 24, 2001. Plaintiff's amended complaint may also include more specific allegations of malicious prosecution in Count IV with respect to the violation of probation charge that allegedly followed plaintiff's arrest on May 12, 1997, but only if those allegations are timely under 745 ILCS 10/8-101. Defendants' motion to dismiss is granted with prejudice with respect to Counts II, III and IV—but only insofar as the latter claim relies on plaintiff's arrests on June 8, 1997, July 14, 1997, or September 21, 1997 (plaintiff's Illinois malicious prosecution claim stands with respect to the charges brought against plaintiff following his arrest on May 12, 1997). Finally, defendants' motion to dismiss Count V is denied. Should plaintiff file an amended complaint on or before September 24, 2001, defendants are ordered to respond thereto by October 15, 2001. This matter is set for a status hearing at 9:00a.m. on October 18, 2001.

**ENTER:** **September 4, 2001**

_____
**Robert W. Gettleman**
**United States District Judge**