# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Robert W. Gettleman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 7222 | **DATE** | September 26, 2003 |
| **CASE TITLE** | Ronnie Evans v City of Chicago, et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Hearing

(5) ☐ Status hearing

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
　　 ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]

Memorandum opinion and order entered. Defendant Officers' motion for summary judgment is granted in its entirety, resolving counts I, II, IV and V of plaintiff's second amended complaint. The Court also grants summary judgment to defendant City with respect to count III. Defendant Officers' motion to strike affidavit is denied as moot.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | number of notices | | Document Number |
|---|---|---|---|---|---|
| | No notices required. | | | | |
| X | Notices mailed by judge's staff. | | SEP 2 6 2003 | | |
| | Notified counsel by telephone. | | date docketed | | 112 |
| | Docketing to mail notices. | | | | |
| | Mail AO 450 form. | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | | | |
| GDS | courtroom deputy's initials | | date mailed notice | | |
| | | | mailing deputy initials | | |

U.S. DISTRICT COURT
CLERK

03 SEP 26 PM 12: 30

Date/time received in
central Clerk's Office

RONNIE EVANS, )
)
      Plaintiff, )
) No.    00 C 7222
    v. )
) Judge Robert W. Gettleman
CITY OF CHICAGO, and Chicago Police Officers )
JOSEPH MCCARTHY, Star 7818, ROBERT )
HOFER, Star 3860, R. BULLINGTON, Star 8684, )
MICHAEL KOZENKO, Star 7577, J. HLADICK, )
Star 18980, RICHARD COYLE, Star 13046, )
MARK SMITH, Star 12935, and TONY GREEN, )
Star 18670, )
)
      Defendants. )

DOCKETED

SEP 2 6 2003

## MEMORANDUM OPINION AND ORDER

      In his second amended complaint,[1] plaintiff Ronnie Evans seeks damages against eight Chicago police officers (collectively "the Officers") and the City of Chicago ("the City"), alleging: (1) racketeering activity in violation of The Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§1961-1968, against the Officers (Count I); (2) violations of his First Amendment rights against the Officers and the City (Counts II and III, respectively); (3) a state law claim for malicious prosecution against the City and the Officers (Count IV); and (4) a state law claim for intentional infliction of emotional distress ("IIED") against the City and the Officers (Count V). The Officers have moved for summary judgment on Counts I, II, IV, and V. For the reasons stated herein, the Officers' motion is granted in its entirety.

---

      [1]The procedural history of the instant case is chronicled in Evans v. City of Chicago, No. 00C7222, 2001 WL 1028401 (N.D.Ill. Sept. 6, 2001) ("Evans I"), Evans v. City of Chicago, No. 00C7222, 2001 WL 1654769 (N.D.Ill. Dec. 20, 2001) ("Evans II"), and Evans v. City of Chicago, No. 00C7222 (N.D.Ill. January 18, 2002) (order denying defendant City of Chicago's motion to dismiss plaintiff's First Amendment claim) ("Evans III").

112

# FACTS[2]

On September 6, 1996, plaintiff was convicted of possession of a controlled substance ("PCS") and received a sentence of probation for twelve months. Plaintiff knew that if he violated the conditions of his probation (by committing another crime, for example), his probation could be revoked and he could be remanded to jail on his 1996 PCS conviction.

On March 22, 1997, plaintiff's cousin, Frankie Ann Perkins, died while being taken into police custody for a drug offense by two of the defendants, Officers McCarthy and Hofer. Plaintiff subsequently appeared on a local news program and claimed that he had witnessed police officers strangle his cousin to death. The Chicago Police Department then opened an investigation into Perkins' death, which was converted into an investigation by the Office of Professional Standards ("OPS"). On September 2, 1997, plaintiff made a statement to OPS, stating that the arresting officers had struggled with his cousin, choked her and dragged her.

On April 7, 1997, the Estate of Frankie Ann Perkins filed a lawsuit against the City of Chicago and Officers Hofer and McCarthy, which was dismissed on September 20, 1999, pursuant to a settlement agreement. In April 1997, approximately two weeks after Perkins' death, Officers McCarthy and Bullington stopped plaintiff and asked him why he lied on television. Approximately two weeks later, Officers McCarthy and Bullington stopped plaintiff on the block where he lived and put him against a fence, searched him and stated that they knew he was on probation. Within a month of Perkins' death, Officers McCarthy, Bullington, Coyle and Kozenko pulled up to a vacant lot adjacent to plaintiff's home. Plaintiff asserts that Officer

---

[2]Unless otherwise noted, the following facts, taken from the parties' L. R. 56.1 Statements and attached exhibits, are not in dispute.

Bullington ordered him to take off his clothes and that Officer Coyle or Officer Kozenko spread plaintiff's buttocks and shined a flashlight up his anus.

On May 12, 1997, Officers McCarthy, Bullington, Coyle and Kozenko arrested plaintiff, Doris Jones, and Anthony Gray and charged them with possession of a controlled substance ("PCS"). Plaintiff maintains that, during that arrest, Bullington, Coyle, and Kozenko physically abused him, and then beat him in the parking lot of the police station. According to plaintiff, after his arrest, he was stripped naked and beaten in the 11th District police station. Plaintiff further maintains that Officer Bullington then took him around the station and told officers in the station that plaintiff likes to go on television and that they should arrest him whenever they see him.

Plaintiff was released on bond shortly thereafter. On June 10, 1997, the criminal court found probable cause for the May 12, 1997, arrests of Jones and plaintiff. In approximately May or June 1997, Officer Hofer stopped plaintiff and questioned him about his relationship to the Perkins family. In his affidavit, plaintiff states that Officer Hofer frisked him and questioned him about the lawsuit during this encounter. Plaintiff further testified at his deposition that in late May or early June of 1997, Officers McCarthy and Bullington approached plaintiff while he was on his front porch drinking beer and then spilled out his beer. According to plaintiff, Officer Bullington also made a motion as though he was going to hit plaintiff but stopped himself.

On June 8, 1997, Officer Hladick, a beat officer assigned to the 11th District, arrested plaintiff for PCS. Shortly thereafter, plaintiff claims that Officers Hladick and one of his partners drove down plaintiff's crowded street and announced over their loudspeaker, "Ronnie Evans, we are coming to get you."

3

On July 14, 1997, Officers Green and Smith, who were assigned to the 11th District Tactical Unit, arrested plaintiff for PCS. At the time of the May 12, 1997, June 8, 1997, and July 14, 1997, arrests, plaintiff was on probation as a result of his 12-month probation sentence on his 1996 PCS conviction. On June 10, 1997, a prosecutor filed a Violation of Probation charge ("VOP") with regard to that 1996 conviction.

At his deposition, plaintiff testified that in late August 1997, Officers Koyle and Kozenko stopped, searched and handcuffed plaintiff, questioned him about the Perkins' case, and then drove him around the corner to where Officers McCarthy and Bullington were waiting. At that point, the officers allegedly discussed the fact that a woman who viewed the arrest yelled something at the them from her window. The officers then released plaintiff, telling him it was his lucky day. Although the officers did not brandish any weapons, plaintiff testified that he believed they "were probably going to take my life that night."

On September 5, 1997, Officer Hofer (along with another officer who is not a defendant in the instant case) arrested plaintiff on an outstanding warrant. On September 21, 1997, plaintiff was arrested for disorderly conduct by Officers McCarthy and Bullington. The ensuing criminal case relating to that arrest was dismissed with leave to reinstate on November 10, 1997.

Plaintiff was taken into custody in December 1997. On April 2, 1998, attorney Daniel Alexander filed an appearance in criminal court on plaintiff's behalf. On or before October 5, 1998, Alexander filed a motion to suppress in connection with the charges stemming from plaintiff's July 14, 1997, arrest, arguing lack of probable cause. Alexander also filed a second motion to suppress with respect to the VOP charge, which incorporated the October 5, 1998,

4

motion to suppress for lack of probable cause and added allegations that the July 14, 1997, arrest giving rise to the VOP "was part of a pattern of police harassment" against plaintiff.

After hearing testimony from several witnesses regarding plaintiff's motion to suppress with respect to the VOP charge, the court denied the government's motion for a directed finding against plaintiff. That suppression motion was continued, but never decided, because the VOP charge was withdrawn by the state on January 14, 2000, by which time plaintiff had served all of the time allowed on his 1996 conviction. That same day, the court entered an order resolving the VOP charge as "PTU," or "Probation Terminated Unsatisfactory."

On July 16, 1999, attorney Thomas Brandstrader filed an appearance with the criminal court, substituting for Alexander. On February 25, 2000, Brandstrader argued the October 5, 1998, motion to suppress for lack of probable cause with respect to the July 14, 1997, arrest, which was denied. After a bench trial, during which Brandstrader did not put on any witnesses and stipulated to the facts that the criminal court heard regarding the motion to suppress, the criminal court found plaintiff guilty of the July 14, 1997, charges. Brandstrader subsequently appealed the conviction (specifically the denial of plaintiff's motion to suppress), which was affirmed by the state appellate court.

Brandstrader and Assistant State's Attorney Brian Clauss then entered into plea negotiations regarding the May 12, 1997, and June 8, 1997, charges. According to Brandstrader's affidavit:

> [Mr. Clauss] offered to allow my client to plead guilty to either one of the remaining two charges (the June 8 or the May 12 charges), and that after the guilty plea, Mr. Clauss would move for a nolle prosequi on the other charge. Mr. Clauss offered to allow my client to choose on which of the remaining two charges Mr. Evans would plead guilty. The prosecutor also offered to recommend the

5

minimum sentence on the plea. As is my duty and obligation, I informed my client of the plea negotiations and offer. After talking to my client, I related to Mr. Clauss that Mr. Evans agreed to plead guilty to the June 8 charge.

Plaintiff does not dispute that on March 17, 2000, he pled guilty to the June 8 charge and that Clauss subsequently moved to nolle prosequi the May 12 charge.[3] Plaintiff was then sentenced to four years upon the recommendation of the parties, which was the minimum allowable sentence. Notwithstanding Clauss' and Brandstrader's affidavits to the contrary, however, plaintiff disputes that there was any agreement to drop the May 12, 1997, charge in exchange for the plea in the June 8, 1997, charge. Plaintiff was given credit for time served and was released on March 17, 2000.

Plaintiff was unemployed from 1994 through the time of his incarceration. After his release, however, he obtained employment and is currently earning $250 per week.

Alexander charged plaintiff $10,000 in fees to resolve all pending criminal charges, including the VOP charge, without reference to specific cases. Plaintiff has not yet paid Alexander's fees, however, had no written fee agreement, and has not received any bills or invoices.

Brandstrader also charged plaintiff $13,500 in fees. According to Brandstrader's affidavit, he agreed to charge plaintiff a set fee of $10,000 for all four pending criminal matters, but did not itemize or attribute any portion of the fees to a particular charge. Brandstrader further noted that none of those fees was solely attributable to the criminal charges arising out of the

---

[3]According to Clauss' affidavit, he did not move to nolle prosequi the May 12, 1997, charges against plaintiff due to any indication of innocence. To the contrary, Clauss believes that if the May 12, 1997, charges against plaintiff had gone to trial, it would have resulted in a conviction against him. Indeed, plaintiff's co-arrestee on the May 12, 1997, charges was found guilty.

6

May 12, 1997, arrest that Clauss moved to nolle prosequi. Rather, Brandstrader's work "applied either to the trial arising out of the July 14 charges, or to the consolidated criminal charges as a whole." Brandstrader received a $10,000 check for these fees from plaintiff's aunt. Plaintiff further incurred a subsequent fee of $3,500, which was attributable to an (ultimately unsuccessful) appeal of the conviction arising from July 14, 1997, charge, which was never paid to Brandstrader. At his deposition, Brandstrader acknowledged that had there been only one case pending against plaintiff, as opposed to four, it is "fair to say" that his fee would have been lower.

At unspecified times, plaintiff complained about the Officers' treatment of Perkins and/or himself to the FBI, Operation Push, Congressmen Danny Davis and Bobby Rush, and the U.S. Attorney. Plaintiff provided statements to OPS on May 16, 1997, and August 26, 1997, regarding his May 12, 1997, arrest and the Spring 1997 strip search incident. Plaintiff also appeared on television in 2002 with his attorney to talk about his allegations in the instant case. Although plaintiff maintains that "he was never intimidated into changing his version of the killing of his cousin or the harassment of himself, and he never withdrew his complaints against the defendant officers," plaintiff asserts that his 28-month incarceration limited his ability to speak out.

According to the affidavit of Jerome Hudson, whose relationship to plaintiff is unclear, in September 2001, two police officers approached Hudson on his porch, grabbed, him, handcuffed him, and asked him, "Have you seen Ronnie?" When Hudson asked, "Who is Ronnie?" the heavyset officer yelled at him, "Don't play with me." According to Hudson's affidavit, the

officer then said, "I'm going to catch that fucking guy." The Officers deny these statements, however.

As noted earlier, plaintiff's second amended complaint asserts RICO, First Amendment, malicious prosecution, and IIED claims against the Officers and City arising from the facts described herein. The Officers have moved for summary judgment on all of plaintiff's claims against them pursuant to Fed. R. Civ. P. 56. Specifically, the Officers maintain that: (1) under the principles of collateral estoppel, the Officers are entitled to summary judgment with respect to plaintiff's RICO, First Amendment, and IIED claims; (2) plaintiff has not suffered a "business injury" and thus lacks standing to assert a RICO claim, and has otherwise failed to establish the "pattern of racketeering" and "enterprise" elements of his RICO claim; (3) plaintiff's speech was not regarding a matter of public concern and also was not "chilled," both of which defeat plaintiff's First Amendment claim; (4) neither the May 12, 1997, charge nor the VOP charge were resolved in plaintiff's favor, defeating plaintiff's claim of malicious prosecution with respect to those charges, and (5) plaintiff's First Amendment and IIED claims are time-barred.

## DISCUSSION

A movant is entitled to summary judgment under Fed. R. Civ. P. 56 when the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Unterreiner v. Volkswagen of America, Inc., 8 F.3d 1206, 1209 (7th Cir. 1993). Admissible evidence must be evaluated in favor of the nonmoving party. Anderson v. Liberty Lobby, Inc, 477 U.S. 242, 255 (1986).

8

1.  **Collateral Estoppel**

The Officers maintain that plaintiff is collaterally estopped from litigating his RICO, First Amendment, and IIED claims in the instant case because he already litigated those issues in connection with the criminal proceedings brought against him. According to the Officers:

> [Plaintiff's] Motion to Suppress raised the issues of harassment, intimidation and retaliation for plaintiff being a witness against the Officers in connection with Ms. Perkin's death. In denying the Motion to Suppress, the criminal court necessarily rejected the claims of a pattern of harassment, intimidation or retaliation for being a witness against the Officers.... All plaintiff does here is convert his Motion to Suppress into a federal complaint, cloaking it with the language of RICO, First Amendment, and IIED. Asserting the same issues as a different cause of action does not preclude application of collateral estoppel; it is the essence of collateral estoppel.

Under Illinois law, a party is precluded from relitigating an issue in a subsequent proceeding when: (1) the party against whom the estoppel is asserted was a party to the prior adjudication; (2) the issues which form the basis of the estoppel were actually litigated and decided on the merits in the prior suit; (3) the resolution of the particular issues was necessary to the court's judgments; and (4) those issues are identical to the issues raised in the subsequent suit. Cook County v. Midcon Corp., 773 F.2d 892, 898 (7th Cir. 1985).

Plaintiff does not dispute that he was a party to the prior adjudication, or that the instant suit involves many of the same issues of harassment and retaliation about which the criminal court heard extensive testimony. Rather, plaintiff emphasizes that he filed two distinct motions to suppress in criminal court: (1) the October 5, 1998, motion to suppress with respect to the July 14, 1997, PCS charge, and (2) his subsequent motion to suppress with respect to the VOP charge. The first suppression motion, relating to the July 14, 1997, charge, was based on a lack of probable cause and was ultimately denied on February 25, 2000. The subsequent motion to

9

suppress, relating to the VOP charge, incorporated the former motion to suppress and included additional allegations of harassment and retaliation.

Although the criminal court held multiple, protracted hearings with respect to the motion to suppress in the VOP case and the related allegations of harassment and retaliation, the court never reached the merits of that motion because the VOP charge was withdrawn. Accordingly, the issues of harassment and retaliation which form the basis of the Officers' assertion of collateral estoppel were never decided on the merits.[4] Thus, plaintiff is not collaterally estopped from raising those issues in the instant case.

## 2.   RICO

The Officers contend that they are entitled to summary judgment with respect to plaintiff's RICO claim because: (1) plaintiff has not suffered a "business injury" sufficient to confer RICO standing; (2) plaintiff has not demonstrated that Officers Hofer, Hladick, Green and Smith each committed two predicate acts; and (3) plaintiff has not produced sufficient evidence of a RICO "enterprise" or "pattern of racketeering activity." Because the first issue is dispositive, the court declines to address the other issues raised by the Officers.

In his second amended complaint, plaintiff bases his RICO claim on 18 U.S.C. §§ 1962(c) and (d). Section 1962(c) makes it unlawful for,

> any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

---

[4] Although the criminal court never conclusively reached the merits of plaintiff's motion to suppress with respect to the VOP charge, it bears emphasizing that the criminal court actually denied the government's motion for a directed finding at the close of plaintiff's argument with respect to that motion.

Section 1962(d) provides that "it shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

In order to have standing under RICO, plaintiff must have sustained an injury to his business or property that was proximately caused by some act of the Officers that was an "act of racketeering or otherwise unlawful under [RICO]." Beck v. Prupis, 529 U.S. 494, 495 (2000). See also 18 U.S.C. § 1964(c) (conferring RICO standing on any person "injured in his business or property by reason of a violation of Section 1962"). In Evans I, this court held that plaintiff's allegations that he lost thousands of dollars in wages while he was incarcerated and that he had to pay thousands of dollars in attorneys' fees as a result of defendants' conspiracy constitute "injuries to plaintiff's property that can be shown to have been proximately caused by the Officers' allegedly unlawful conduct." Evans I, 2001 WL 1028401, at *5.

With the benefit of discovery, the Officers now maintain that plaintiff cannot prove any actual loss of income due to his incarceration and that lost income potential cannot establish RICO standing. The court agrees. Plaintiff does not dispute that he was not gainfully employed during the three years before his 1997 incarceration. Thus, any alleged loss of income resulting from plaintiff's incarceration is speculative, at best. Because it is well-established that RICO claims must be based on concrete, rather than speculative, injuries, plaintiff's lost income potential based on earnings since his release is insufficient to confer RICO standing. See, e.g., Steele v. Hospital Corp. of America, 36 F.3d 69 (9th Cir. 1994) ("[S]peculative injuries do not serve to confer standing under RICO, unless they become concrete and actual."); Anderson v. Lincoln Insurance Agency, Inc., 2003 WL 291928, at *3 (N.D.Ill. Feb. 10, 2003) ("Plaintiffs cannot allege any out-of-pocket or other concrete financial loss and, thus, have no standing under

11

RICO."); Pelfresne v. Village of Rosemont, 22 F. Supp. 2d 756, 765 (N.D. Ill. 1998) (Plaintiffs may not establish RICO standing by "rely[ing] on injuries that have not yet occurred.").

Whether plaintiff's incurred attorneys' fees are sufficient to confer RICO standing is a more difficult question, however. According to plaintiff, he would owe less in attorneys' fees had there been fewer cases pending against him. The Officers respond, "Plain and simple, plaintiff cannot prove that he incurred any attorneys' fees exclusive of the June 8, 1997, July 14, 1997 or VOP charges, all resolved against plaintiff. Since the fees cannot be separated from fees incurred on plaintiff's valid convictions, the fees cannot confer standing for RICO."

Plaintiff concedes that he did not incur attorneys' fees as a result of the numerous incidents of harassment that did not result in the filing of criminal charges against him. Further, plaintiff apparently acknowledges that fees incurred as a result of lawful convictions - specifically, his conviction relating to his July 14, 1997, arrest and his guilty plea relating to his June 8, 1997, arrest - do not qualify as a business injury sufficient to confer RICO standing.[5] Thus, the question that the court must resolve is whether the fees relating to the two charges against plaintiff which did not result in convictions - specifically, (1) the VOP charge which was withdrawn and resulted in the entry of a "PTU," and (2) the May 12, 1997, charge which was nolled - establish RICO standing.

Plaintiff admits that he violated his probation by committing a crime during the probationary period. See also 730 ILCS 5/5-6-3(a)(1) ("The conditions of probation and of conditional discharge shall be that the person: (1) not violate any criminal statute of any

_____

[5]According to plaintiff, "The jury can decide how much of the fees incurred are related to the RICO activity and how much are related to the two cases where convictions resulted."

jurisdiction...."). Plaintiff's July 14, 1997, arrest resulted in a conviction, and plaintiff also pled guilty to the June 8, 1997, PCS charges against him. Neither of these dispositions has been disturbed on appeal or in other collateral proceedings, and thus these convictions constitute violations of plaintiff's probation. Although the VOP charge was withdrawn prior to those dispositions, and the criminal court never reached the merits of plaintiff's VOP charge, it is undisputed that plaintiff in fact violated the terms of his probation. The court therefore declines to confer RICO standing on the basis of attorneys' fees stemming from the VOP charge.

Similarly, plaintiff's attorneys' fees relating to the May 12, 1997, charge that was nolled are also not properly considered a business or property injury that confers RICO standing. According to the Officers, "plaintiff's claim that he would have incurred a lesser amount of fees if there had been three charges, instead of four, is conjecture." Indeed, it is undisputed that plaintiff's fee arrangements with attorneys Alexander and Brandstrader did not specify that any particular portion of their fees would be attributable to a particular pending criminal charge; rather, each attorney charged plaintiff $10,000 to work on all four pending charges. Further, Brandstrader's affidavit, which has not been refuted by plaintiff, establishes that all of Brandstrader's work on plaintiff's behalf "applied either to the trial arising out of the July 14 charges, or to the consolidated criminal charges as a whole." Thus, none of Alexander's and Brandstrader's fees are attributable solely to the May 12, 1997, charge.

In response, plaintiff simply asserts that he would have incurred fewer fees if there had been fewer criminal charges against him, and suggests that the precise amount of the reduction in fees that would have resulted had the May 12, 1997, charge not been brought is a question of fact that falls within the province of the jury.

13

As noted earlier, RICO standing must be based on concrete, rather than speculative, injuries. Aside from his own affidavit,[6] plaintiff has not provided any fee agreements, itemized bills, or testimony from Alexander or Brandstrader to support his assertion that his fees would have been lower if there had been three, rather than four, charges brought against him. Although the court is mindful of its obligation to draw all reasonable inferences in plaintiff's favor regarding the instant motion for summary judgment, plaintiff must still produce sufficient evidence to create a genuine issue of material fact to defeat the motion. Plaintiff's self-serving affidavit, unsupported by evidence in the record, is certainly not sufficient to defeat summary judgment. See, e.g., Shank v. William R. Hague, Inc., 192 F.3d 675 (7th Cir. 1999) (plaintiff's affidavit insufficient to create a genuine issue of material fact in absence of evidence in the record to support the assertions contained therein); Karazanos v. Navistar Intern. Transp. Corp., 948 F.2d 332, 337 (7th Cir. 1991)("[A] plaintiff's speculation is not a sufficient defense to a summary judgment motion."). Accordingly, the Officers' motion for summary judgment is granted with respect to plaintiff's RICO claim.

---

[6]Specifically, paragraph 7 of plaintiff's affidavit, which addresses his incurred attorneys' fees, provides: "The $10,000 legal fee which was paid to Brandstrader (which I borrowed from my aunt) was intended to cover three jury trials and the VOP case. Brandstrader appeared in court several times on all four pending charges before putting on the suppression hearing relative to the July 14, 1997 arrest. Had there been less than four cases pending, I would have paid Brandstrader less money. The $10,000 legal fee to Alexander was for all four cases and compensated him for the many court appearances and pleadings he filed with respect to all four cases against me. Had there been less than four cases, I would have incurred less than a $10,000 debt to attorney Alexander." Yet, when plaintiff took Brandstrader's deposition, plaintiff's attorney asked him only whether his fee would have been lower had there been only one case involved (as opposed to three), to which Brandstrader replied, "I guess that's fair to say. Yes." Accordingly, plaintiff's affidavit, which implies that Brandstrader's fee would have been less had there been three cases rather than four, is unsupported by the record.

### 3.    § 1983/First Amendment

According to the Officers, plaintiff's First Amendment claim fails because it is barred by

the statute of limitations.[7]   Section 1983 claims arising in Illinois are governed by a two-year

statute of limitations.   Kelly v. City of Chicago, 4 F.3d 509, 511 (7th Cir. 1993).   Plaintiff does

not dispute that, aside from criminal court proceedings, he did not have any contact with the

defendant Officers since 1997.   Rather, relying on this court's decision in Evans III, plaintiff

maintains that he has established a continuing course of conduct by the Officers which persisted

through September 2001.   Plaintiff also maintains that "the conduct complained of includes that

plaintiff was targeted for prosecution because of his speech, thus the statute does not start to run

until the prosecutions are abandoned or terminated."   For the reasons stated below, the court

concludes that both of plaintiff's arguments are without merit.

In Evans III, the court denied defendants' motion to dismiss plaintiff's First Amendment

claim on statute of limitations grounds.   In that opinion, the court stated:

> According to the City, plaintiff's claims accrued at the various times he was
> arrested and, because more than two years elapsed from those dates to the date the
> instant suit was filed, his First Amendment claim is time-barred.   Plaintiff
> responds that by adding an allegation in his second amended complaint of
> unlawful conduct on the part of defendants in November 2001, plaintiff has
> alleged a "continuing course of conduct by ... defendants," which allows him to
> reach back and seek redress for defendants' 1997 conduct.   Assuming that all of
> plaintiff's allegations are true (as the court must at this stage), the court finds it
> conceivable that plaintiff will be able to establish that defendants continually
> violated his First Amendment rights by arresting him for, charging him with, and

---

[7]The Officers also argue that plaintiff has not produced evidence that his speech was in
fact "chilled" as a result of the Officers' alleged harassment of him.   Because the court concludes
that the statute of limitations issue is dispositive with respect to plaintiff's First Amendment
claim, it declines to reach the merits of the Officers' argument regarding the chilling effect of
their actions on plaintiff's speech.

then supplying testimony in support of, baseless claims designed to retaliate against him for exercising his constitutional right to speak freely about a matter of public concern. [Emphasis added.]

The only incident in 2001 regarding the Officers' alleged harassment of plaintiff involved plaintiff's acquaintance, Jermaine Hudson. According to Hudson's affidavit, two (unnamed) uniformed police officers approached him on his porch, asking if he had seen plaintiff. When Hudson asked who plaintiff was, one of officers said, "Don't play with me.... I'm going to catch that fucking guy."

The continuing violation doctrine is not a tolling mechanism, but rather governs the time at which a cause of action accrues. Heard v. Sheahan, 253 F.3d 316, 319-320 (7th Cir. 2001). "The continuing violation doctrine applies when the unlawfulness of defendant's actions becomes apparent only after the cumulation of a series of related events; it does not apply to a series of related, but discrete, discriminatory acts." Patterson v. County of Cook, 2003 WL 21418337, at *2 (N.D.Ill. June 17, 2003) (citing Clark v. City of Braidwood, 318 F.3d 764, 767 (7th Cir. 2003); Tinner v. United Ins. Co. of Am., 308 F.3d 697, 708-09 (7th Cir. 2002)).

In the instant case, plaintiff was on notice that his First Amendment rights were allegedly being violated back in 1997 when he was stopped, arrested, and harassed. Indeed, plaintiff filed a motion to suppress with respect to his VOP charge in October 1998, essentially raising identical allegations of harassment and retaliation as those at issue in the instant case. Aside from alleging that the 2001 incident occurred, and providing Hudson's affidavit in support thereof, however, plaintiff has failed to produce any evidence connecting the 2001 incident - which occurred after, (1) the termination of the Perkins' lawsuit in which plaintiff testified, (2) the termination of the criminal proceedings brought against plaintiff, (3) plaintiff's filing of

complaints against the Officers, and (4) plaintiff's release from custody - with his alleged inability to speak out regarding his cousin's death and the alleged harassment that took place during 1997. Accordingly, plaintiff may not invoke the 2001 incident as a continuing violation to resuscitate his otherwise untimely claims.

Although the court held in <u>Evans III</u> that it was "conceivable" that plaintiff would be able to establish a continuing violation, and thus denied defendants' motion to dismiss plaintiff's First Amendment claim, that decision was animated by the liberal federal pleading standards applied to motions to dismiss. As noted earlier, to survive a motion for summary judgment, in contrast, plaintiff must come forward with some evidence that creates a triable issue of material fact, which he has failed to do.

The fact that the criminal proceedings instituted against plaintiff continued through early 2001 does not compel a contrary outcome. Plaintiff maintains that, like his malicious prosecution claim, he must plead that the criminal proceedings were terminated in his favor in order to state a First Amendment retaliation claim against the Officers, and thus the statute of limitations does not begin to run until the prosecutions are abandoned or terminated. The court disagrees.

Although the parties have not cited to any controlling precedent articulating the elements of a First Amendment retaliation claim in the context of a criminal prosecution, the Seventh Circuit has stated on more than one occasion that "an act in retaliation for the exercise of a constitutionally protected right is actionable under Section 1983 even if the act, when taken for a different reason, would have been proper." <u>Buise v. Hudkins</u>, 584 F.2d 223, 229 (7th Cir. 1978);

Matzker v. Herr, 748 F.2d 1142, 1150 (7th Cir. 1984) (limited on other grounds). Thus, to state a

claim for retaliation in violation of the First Amendment, a complaint need not allege that the

proceedings were unsupported by probable cause or that criminal proceedings were terminated in

plaintiff's favor. See, e.g., Lackey v. County of Bernalillo, No. 97-2265, 1999 WL 2461, at *3

(10th Cir. Jan. 5, 1999) ("To prevail on a claim of unconstitutional retaliation in violation of the

First Amendment, a plaintiff must establish (1) he was engaged in constitutionally protected

activity, (2) defendant's actions caused him to suffer an injury that likely would chill a person of

ordinary firmness from continuing to engage in that activity, and (3) defendant's adverse action

was substantially motivated as a response to the plaintiff's exercise of constitutionally protected

conduct.").[8] The statute of limitations on plaintiff's First Amendment retaliation claim therefore

began to run prior to the termination of the criminal proceedings against him, and the Officers are

entitled to summary judgment on Count II.

**4.      Malicious Prosecution**

To prevail on his claim of malicious prosecution under Illinois law,[9] plaintiff must

establish that: (1) the defendant(s) brought the underlying suit maliciously and without probable

cause; (2) the action terminated in a manner favorable to plaintiff; and (3) the plaintiff suffered

---

[8]Even assuming arguendo that termination of proceedings in his favor is a required element of a First Amendment retaliation claim in the instant context, as discussed in Section 4 (below), the record demonstrates that none of the criminal proceedings in the instant case was terminated in plaintiff's favor: the July 14, 1997, arrest resulted in a conviction; plaintiff pled guilty to the June 8, 1997, charges; the prosecutor entered a nolle prosequi with respect to the May 12, 1997, charges; and the VOP charge was withdrawn after plaintiff had already served the maximum time allowed under his 1996 conviction.

[9]In Evans I, the court dismissed all claims for malicious prosecution except for state law claims based upon the May 12, 1997, charge and the VOP charge. See Evans I, 2001 WL 1028401, at *9 (citing Newsome v. McCabe, 256 F.3d 747 (7th Cir. 2001)).

some special injury beyond the usual expense, time or annoyance in defending the lawsuit. Cult Awareness Network v. Church of Scientology International, 685 N.E.2d 1347, 1350 (Ill. 1997). As the Officers correctly point out, neither the May 12, 1997, charges nor the VOP charges were resolved in plaintiff's favor, entitling the Officers to summary judgment on plaintiff's malicious prosecution claim.

As noted earlier, the May 12, 1997, charge was terminated by the granting of the prosecutor's motion to nolle prosequi the charges against plaintiff. "A nolle prosequi may serve as a favorable termination unless the prosecution was abandoned for reasons not indicative of the innocence of the accused." Cult Awareness, 685 N.E.2d at 1354 (citing Swick v. Liautaud, 662 N.E.2d 1238 (Ill. 1996)). The burden of proof of a favorable termination, however, remains with the plaintiff. Swick, 662 N.E.2d at 1243. Thus, "[o]nly when a plaintiff establishes that the nolle prosequi was entered for reasons consistent with his innocence does the plaintiff meet his burden of proof." Id. A nolle prosequi is not indicative of innocence when it "is the result of an agreement or compromise with the accused...." Id.

Both the prosecutor and Brandstrader have testified that plaintiff's May 12, 1997, charge was nolled as a result of a plea bargain. According to Brandstrader's affidavit, the prosecutor "offered to allow [plaintiff] to plead guilty to either one of the remaining two charges (the June 8 or May 12 charges), and that after the guilty plea, [the prosecutor] would move for a nolle prosequi on the other charge." Brandstrader further maintains that he informed plaintiff of the plea negotiations and offer. Consistent with Brandstrader's and the prosecutor's version of events, the criminal court transcript reflects that only after plaintiff's guilty plea regarding the June 8 charges did the prosecutor move to nolle the May 12 charges.

19

Although plaintiff admits that his discussion with his criminal defense attorney addressed the prosecutor dropping the May 12 charges and plaintiff pleading guilty to the June 8 charges, plaintiff maintains that "[t]here was never any agreement to drop the May 12, 1997, charge in exchange for the plea on the June 8, 1997, case." Plaintiff further asserts in his affidavit that he "heard ASA Clauss tell Brandstrader that he knew the May 12, 1997 case 'was not a good case' and that he didn't 'think [he] could win it.'"

The Officers maintain that plaintiff's self-serving affidavit, unsupported by the record, is inadmissible to create an issue of fact and fails to meet the evidentiary standards for admissible testimony. Further, the Officers argue that "what plaintiff's criminal defense attorney told plaintiff is irrelevant both as to the reasons why the prosecutor moved to <u>nolle</u> the May 12, 1997 charges and the undisputed actual terms of the plea agreement between the prosecutor and the criminal defense attorney."

As noted earlier, plaintiff bears the burden of demonstrating that the circumstances surrounding the entry of the <u>nolle prosequi</u> order were consistent with his innocence. The court concludes that plaintiff's affidavit, specifically paragraphs 4, 5 and 6 thereof, does not refute the undisputed terms of the agreement between the prosecutor and Brandstrader, which were that the prosecutor would drop one of the two remaining charges against plaintiff in return for a guilty plea on the other charge. Whether or not Brandstrader communicated this agreement to his client goes to whether the plea was knowing and voluntary, rather than whether the <u>nolle prosequi</u> was entered for reasons consistent with plaintiff's innocence. This conclusion is bolstered by the fact that the criminal court also concluded that there was probable cause as to the May 12 arrest, and that the court entered the <u>nolle prosequi</u> only after plaintiff pled guilty to the June 8 charges. Put

20

simply, plaintiff has not offered evidence that would create a triable issue of material fact as to whether the May 12 charges were nolled for reasons consistent with his innocence.

The court draws the same conclusion with respect to plaintiff's VOP charge. As noted earlier, the prosecutor testified that the VOP charge was withdrawn by the government on January 14, 2000, because, by that time, plaintiff had already served all of the time allowed on his 1996 conviction. Rather than refuting the prosecutor's testimony on that issue, plaintiff submitted portions of Brandstrader's deposition testimony, which were consistent with the account provided by the prosecutor.[10] Further, after withdrawal of the VOP charge, the court entered an order resolving the VOP charge as "PTU," or "Probation Terminated Unsatisfactory." Viewing the record as a whole, no reasonable jury could conclude that the circumstances surrounding the withdrawal of the VOP charge were consistent with plaintiff's innocence.

It is also worth noting that plaintiff's July 14, 1997, arrest subsequently resulted in a conviction, and plaintiff also pled guilty to the June 8, 1997, PCS charges against him. Although the VOP charge was withdrawn prior to those dispositions, it is undisputed that plaintiff in fact violated the terms of his probation. Thus, as to his VOP charge, plaintiff has also failed to establish the first element of his malicious prosecution claim, namely that the VOP charge was brought without probable cause. The Officers are therefore entitled to summary judgment on Count IV.

---

[10]According to Brandstrader, the prosecutor told him off the record that the State withdrew the VOP charge because "[t]he probation is over with - already over with, something like that."

## 5. IIED

The Officers contend that plaintiff's IIED claim is time-barred for the same reasons as plaintiff's malicious prosecution claim. Plaintiff, relying on the court's opinion in Evans I, maintains that his IIED claim is timely.

In Evans I, this court stated, "Plaintiff's IIED claim incorporates the same conduct of the Officers that supports his [] malicious prosecution claim. Thus, as with plaintiff's malicious prosecution claim, 'the clock did not start running on plaintiff's intentional infliction of emotional distress claim until the state criminal proceedings were terminated.'" (Quoting Treece v. Village of Naperville, 903 F. Supp. 1251, 1259 (N.D.Ill. 1995).) Of course, as noted earlier, the factually developed record demonstrates that the criminal proceedings at issue in the instant case were not resolved in plaintiff's favor. Accordingly, the Officers' conduct with respect to the criminal proceedings (specifically, their arrests of plaintiff and their subsequent testimony in resulting criminal proceedings), cannot properly be characterized as extreme and outrageous conduct that would support a claim for emotional distress. See Public Finance Corp. v. Davis, 360 N.E.2d 765, 767 (Ill. 1976) ("Liability [for intentional infliction of emotional distress] has been found only where the conduct has been so outrageous in character and extreme in degree as to go beyond all possible bounds of decency.") (Quoting Restatement (Second) of Torts § 46, comment D (1965).)

As for the alleged harassment and strip searches of plaintiff, those claims accrued back in 1997, more than two years before the filing of the instant suit. Plaintiff's IIED claim arising from those incidents is therefore barred by the applicable one-year statute of limitations under the

Illinois Local Governmental and Governmental Employees Tort Immunity Act, 745 ILCS 10/8-101.

## CONCLUSION

For the foregoing reasons, the Officers' motion for summary judgment is granted in its entirety, resolving Counts I, II, IV, and V of plaintiff's second amended complaint. Although the City did not join the Officers' motion for summary judgment, the Officers' motion notes that if they are entitled to summary judgment on Count II, then the City is also entitled to summary judgment on Count III, which is directed solely against the City for having a policy of violating First Amendment rights. Plaintiff has not responded to this argument, which appears to be meritorious. Thus, the court also grants summary judgment to the City with respect to Count III, as well. The Officers' motion to strike plaintiff's affidavit is denied as moot.

**ENTER:**    **September 26, 2003**

Robert W. Gettleman
**Robert W. Gettleman**
**United States District Judge**