CERTIFIED COPY

# In the
# United States Court of Appeals
## For the Seventh Circuit

FILED
FEB 0 1 2006
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

No. 03-3844

RONNIE EVANS,

*Plaintiff-Appellant,*

*v.*

CITY OF CHICAGO, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. No. 00 C 7222—**Robert W. Gettleman**, *Judge.*

ARGUED NOVEMBER 10, 2004—DECIDED JANUARY 6, 2006

Before COFFEY, RIPPLE and SYKES, *Circuit Judges.*

COFFEY, *Circuit Judge.* On the evening of March 22, 1997, Frankie Ann Perkins, age 37, died following an altercation with two Chicago Police Officers who were allegedly attempting to restrain her while taking her into custody. Ronnie Evans, who resided next door to the vacant lot on Chicago's west side where Perkins died, claims to have witnessed the entire event. In a television news interview taped the next day, Evans announced his version of the events surrounding Perkins' death and in doing so publicly accused the two officers involved of murdering Perkins. In the months that followed, Evans claims he was systematically harassed, intimidated and retaliated against by a number of Chicago Police Officers

who acted in a concerted effort to intimidate and coerce him into changing his story as to the circumstances surrounding Perkins' death.

On November 16, 2000, Evans filed a five count complaint in the United States District Court for the Northern District of Illinois against the City of Chicago ("City") and eight individual Chicago Police officers.[1] Evans' initial complaint, along with a first amended complaint, were dismissed in part, and a second amended complaint was thereafter filed[2] alleging *inter alia* that: the named officers violated the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 42 U.S.C. § 1961, *et seq.*; the officers and the City violated his First Amendment right to free speech, 42 U.S.C. § 1983; the officers and the City violated Illinois law by maliciously prosecuting him; and that the officers and the City also violated Illinois law by intentionally inflicting emotional distress upon him. *See Evans v. City of Chicago*, No. 00-C-7222, 2003 WL 22232963 (N.D. Ill. Sept. 26, 2003). Following discovery, the City filed a motion for summary judgment, which the district court granted, finding that Evans' RICO claim failed as a matter of law because he lacked standing and his § 1983 and Illinois common law claims were barred by

[1] The Chicago Police Officers named in the complaint are: Joseph McCarthy, Robert Hofer, R. Bullington, Michael Kozenko, J. Hladick, Richard Coyle, Mark Smith and Tony Green.

[2] The first two complaints Evans filed were dismissed without prejudice, leaving us to consider only his second amended complaint. A more complete procedural history can be found at *Evans v. City of Chicago*, No. 00 C 7222, 2001 WL 1028401 (N.D.Ill. Sept. 6, 2001), *Evans v. City of Chicago*, No. 00 C 7222 (N.D. Ill. Nov. 28, 2001), *Evans v. City of Chicago*, No. 00 C 7222 (N.D.Ill. Jan. 18, 2002), *Evans v. City of Chicago*, No. 00 C 7222, 2003 WL 22232963 (N.D.Ill. Sept. 26, 2003).

the applicable statutes of limitations, 735 ILCS 5/13-202 and 745 ILCS 10/8-101. Affirmed.

## I. BACKGROUND

At approximately 9:00 p.m. on the evening of March 22, 1997, Ronnie Evans and his cousin, Anthony Gray, were alerted by what they described as flashing colored lights that seemed to be coming from the vicinity of the vacant lot next door to Evans' residence at 3340 West Van Buren street in Chicago, Illinois. Evans claims that, after noticing the flashing lights, he and Gray went to a window on the second floor of the house to determine what the commotion was. Once at the window, Evans witnessed two persons, whom he later identified as Officers Hofer and McCarthy, struggling with a woman, whom he later recognized as his cousin, Frankie Perkins. One of the officers allegedly had his hands around Perkins' neck while the other was struggling to hold her arms behind her back. At some point, the two officers and Perkins fell to the ground and one officer let go of her, while the other officer—who allegedly had his hands around Perkins' neck—fell directly onto Perkins' chest and continued to strangle her. Evans, at that point, presumed that Perkins had passed out or died, because as the officers rolled her over to handcuff her, Perkins was motionless. After Perkins was cuffed, officers allegedly proceeded to drag her unconscious body over to the squad car and unceremoniously lifted and shoved her lifeless body into the back seat of the vehicle. Upon witnessing this, Evans claims he charged out of the house, screaming at the officers "I seen [sic] what you guys did . . . [m]an, you are bogus." While Perkins lay in the back seat of the squad car, Evans overheard the officers radio for ambulance assistance and stated that they failed to perform CPR nor did they make any other attempt to revive Perkins. What's more, when the para-

medics did arrive to attend to Perkins, the officers allegedly told them that the area was a crime scene; meaning that they should not attempt to revive the woman.[3] Perkins was later examined by the paramedics and determined to be dead.[4]

The next morning, representatives of ABC Channel 7 visited the neighborhood in order to conduct interviews concerning Perkins' alleged death at the hands of Chicago Police Officers. Evans agreed to, and did, appear on the news that evening. While relating his view of what happened the previous night, Evans publicly accused the two officers involved of murdering his cousin in cold blood.

After the report aired, the CPD's Office of Professional Standards ("OPS") formally launched an investigation into the incident. In an interview conducted on September 2, 1997, Evans related to OPS officers his version of the events that took place on the evening of March 22, 1997, including his opinion that Officers McCarthy and Hofer participated in the choking death of Perkins. Evans along with Perkins' family also lodged complaints with the Federal Bureau of Investigation and the United States Attorney for the Northern District of Illinois as well as the offices of Congressmen Danny Davis and Bobby Rush

3 Israel Garcia, one of the paramedics who arrived on the scene, testified that he and his partner thoroughly examined Perkins and even hooked her up to an EEG machine, but there were no signs of life. In Garcia's words, she had "flat-lined." Further, Garcia testified that, because Perkins showed no signs of life and because the police had designated the area a crime scene, the paramedics did not attempt to resuscitate her.

4 The record is unclear as to when Perkins was examined, how she was transported and where she was conveyed to after she was taken from the scene. However, it is clear that she died following the altercation with police.

concerning the incident. In addition, Perkins' family filed a wrongful death lawsuit against the City of Chicago and the CPD in the United States District Court for the Northern District of Illinois.[5] The Perkins family hoped that if the case ever went to trial Evans' would testify as to what he witnessed on March 22nd in order to bolster their case against the city.[6]

*A. Evans' Alleged Harassment*

Evans claims that shortly after his appearance on television, he was subjected to a campaign of harassment and terrorization by a number of Chicago Police Officers. Specifically, Evans claims that Officers Joseph McCarthy, Robert Hofer, Robert Bullington, Michael Kozenko, James Hladick, Richard Coyle, Mark Smith and Tony Green[7] committed various illegal and unwarranted offenses against him, e.g., allegedly arresting him without probable cause, threatening him and continually confronting him on the street and at his home in an effort to harass and

---

[5] The complaint also alleged a number of constitutional and civil rights deprivations on Perkins' behalf relating to the events of the night surrounding her death.

[6] As it turns out, the Perkins' family's suit against the city never reached trial, as it was settled on March 24, 1999, with Perkins' family receiving $500,000 in damages.

[7] Evans had contact with many of these officers prior to Perkins' death. For example, in February of 1997, Officers McCarthy and Hoefer (who regularly patroled the area surrounding Evans' home at 3388 West Van Buren) had stopped him and questioned him. No arrest was made at that time. Additionally, just two weeks before Perkins death, Officers McCarthy and Bullington encountered Evans while they were arresting Perkins for possession of narcotics. Perkins was taken into custody, but Evans was questioned and released.

intimidate him. The alleged harassment began in early April 1997—approximately one-and-a-half weeks after the news broadcast—and continued until late December of 1997.[8] According to Evans, the reasoning behind this supposed persecution was to keep him quiet and to discourage him from testifying—either in front of the OPS or in federal court in conjunction with Perkins' pending lawsuit—concerning the incident that he witnessed on the evening of March 22, 1997. On the other hand, the officers claim that Evans was a known drug dealer and they were just doing their job by checking up on him and stopping him, when necessary, to ascertain whether he was in possession of, or dealing, illegal drugs.

Indeed, during this time period Evans was arrested on three separate occasions—May 12, 1997, June 8, 1997[9] and July 14, 1997—for felony possession of a controlled sub-

---

[8] On a number of occasions, Evans describes being accosted on the street and/or near his home by two or more officers. For example, about three weeks after Perkins' death, Evans claims that Officers McCarthy, Bullington, Coyle and Kozenko approached the vacant lot next to Evans' house and proceeded to, without cause, ask him to take off all of his clothes so that they could search him. Evans goes on to assert that officers performed a cavity search on him and then proceeded to laugh at him when he refused to answer any of the questions posed to him. Evans states he was humiliated and angry, noting that he refused to answer any of their questions. According to Evans, incidents such as this continued throughout the summer and fall. What's more, Evans claims that during the same time frame he was simply minding his own business, but that police officers made a point of continually attempting to intimidate and harass him.

[9] In addition, the day following this arrest, June 10, 1997, the Cook County State's Attorney's office filed a violation of probation charge against Evans, relating back to a 1996 conviction he had sustained, also for possession of a controlled substance.

stance, in violation of 720 ILCS 570/402.[10] On each occasion, Evans claims he was arrested without cause and that he was mistreated by police officers. For instance, Evans claims that when he was arrested on May 12, 1997,[11] officers proceeded to kick, punch and otherwise abuse him after chasing him into his house.[12] In addition, Evans claims that after being arrested and transported to the 11th District Police Station, officers resumed beating him in the parking lot before taking him inside the station house and forcing him to strip naked in front of a female detainee. After being allowed to dress, Evans alleges that the officers "paraded" him through the police station, announcing to other officers that he was "the one that was on T.V." and informing them that they should "lock his ass up" whenever they encountered him.[13]

---

[10] Evans was also arrested on September 5, 1997, by Officer Hofer on an outstanding warrant and on September 21, 1997, by Officers McCarthy and Bullington for disorderly conduct.

[11] It should be noted, however, in a hearing concerning Evans' May 12, 1997 arrest, a Cook County Circuit Court judge specifically found that there was indeed probable cause to arrest Evans.

[12] Evans claims that he "possessed no contraband" and that "[t]he defendant officers produced the controlled substances at the 11th District, falsely claiming it had come from Ronnie Evans." However, the police report tells a far different story. According to the police report officers had been conducting surveillance in the area of the 3300 block of West Van Buren on that date and had witnessed six different subjects purchase drugs from three different individuals, later identified as Evans, Doris Jones and Anthony Gray. The report also states that when Evans was approached by officers after distributing what appeared to be contraband, he immediately ran into his house. However, before he reached the door he dropped a baggie containing 20 individual doses of crack cocaine.

[13] Evans was released on a bond a day or two later and placed on house arrest pending an appearance on the charge. Four days
(continued...)

Throughout the summer and fall of 1997, Evans saw fit to fail to appear in Cook County Court on numerous occasions relating to the drug charges brought against him during the summer, i.e., his May 12, 1997, June 8, 1997 and July 14, 1997 arrests, and by December of 1997, Evans had five warrants pending for his arrest. At some point in early December 1997, in order to avoid apprehension, Evans decided to turn himself into Judge Haberkorn, the Cook County Circuit Court Judge handling all of his criminal cases. Judge Haberkorn ordered a deputy to immediately transport him to the Cook County Jail at 26th and California, where he remained until March 17, 2000, approximately 28 months in all.

### *B. Criminal Court Proceedings Against Evans*

In October of 1998, Evans' attorney filed two motions to suppress evidence, both concerning his July 14, 1997, arrest.[14] The circuit court judge heard testimony on the motions on three dates between October 1998 and February 1999, but did not rule on them immediately.

---

[13] (...continued)
after his arrest, on May 16, 1997, Evans made a statement to OPS concerning his arrest on May 12th and told the investigators that arresting officers, in his words, had "used excessive force and had arrested him without probable cause." In the following weeks Evans alleged that he was approached on two other occasions by CPD officers who proceeded to threaten and attempt to intimidate him.

[14] Prior to April 2, 1998 Evans was represented in his various criminal proceedings by two attorneys from the Office of the Cook County Public Defenders. Thereafter, he was represented by a private attorney.

Subsequently, on January 14, 2000,[15] the State of Illinois voluntarily withdrew one of the charges pending against Evans, a violation of probation charge that the State had filed on June 10, 1997, relating back to a 1996 conviction Evans had incurred for possession of a controlled substance. *See supra* p. 6 n.9. The State's Attorney's office felt that because Evans had served the maximum amount of jail time on his 1996 possession of a controlled substance conviction while awaiting trial, the violation of probation charge was, in effect, moot. Shortly thereafter the State moved the Circuit Court to order that the probation charge had been resolved as "PTU" or "probation terminated unsatisfactory." The Circuit Court granted the motion, issuing an order reflecting that Evans had indeed violated his probation, but not reaching the merits of the charge.

On February 25, 2000, Evans' motions to suppress concerning his July 14, 1997 arrest were argued and denied. That afternoon, a short bench trial was held on the July 14, 1997 charge, and Evans was found guilty of possession of a controlled substance and sentenced to one year of probation, probation terminated instanter. With the July 14, 1997 possession of a controlled substance charge resolved, the State then entered into talks with Evans in an attempt to deal with the two remaining pending charges against him, the May 12, 1997 and June 8, 1997 possession of a controlled substance charges. The State's Attorney approached Evans with a plea bargain, whereby Evans could plead guilty to one of the charges and the State would seek the minimum punishment for that crime, four years in prison, and move to *nolle prosequi*

---

[15] The cause of a delay of approximately 10 months is unclear from the record, but it may be due to Evans' change of counsel during that period of time.

the other charge. Evans agreed, and on March 12, 2000 pled guilty to the June 8, 1997 charge. Thereafter, the State, pursuant to the agreement, moved to *nolle prosequi* the May 12, 1997 charge.[16] The Circuit Judge sentenced Evans to four years on the June 8, 1997 charge, with credit for 838 days time served, the period of time he spent in Cook County Jail awaiting trial.

### C. *Evans' Civil Case*

On November 16, 2000, Evans filed a complaint in the United States District Court for the Northern District of Illinois against the City of Chicago and eight Chicago Police Officers.[17] In his second amended complaint,[18] which is pertinent here, Evans claims that he is entitled to

---

[16] The agreement between Evans and the State's Attorney's office to *nolle prosequi* the May 12, 1997 charge in return for a guilty plea on the June 8, 1997 charge is reflected both in the affidavit of Brian Klauss, the Assistant State's Attorney who prosecuted the case, and in the transcript of the sentencing proceedings. At sentencing, Judge Haberkorn expressly acknowledges that Evans is pleading guilty to the June 8, 1997 charge "pursuant to agreement." In addition, the court thoroughly questioned Evans as to his understanding of what his guilty plea meant and as to his intention to enter such a plea voluntarily.

Also, Klauss states in an affidavit that the only reason he moved to *nolle prosequi* the May 12, 1997 charge was because of the agreement. Indeed, he states that, at the time, he "believed that if the matter had gone to trial, it would [have] result[ed] in a conviction, based in large part on the fact that Judge Haberkorn had convicted [co-defendant] Doris Jones of the May 12 charges and had expressed her belief that these same arresting officers were credible in their testimony on the same facts."

[17] *See supra* note 1 and accompanying text.

[18] *See supra* note 2 and accompanying text.

damages, due to the fact that *inter alia*: the named officers violated the RICO, 42 U.S.C. § 1961, *et seq.*; the officers and the City violated his First Amendment right to free speech, 42 U.S.C. § 1983; the officers and the City violated Illinois law by maliciously prosecuting him; and that the officers and the City also violated Illinois law by intentionally inflicting emotional distress upon him. *See Evans v. City of Chicago*, No. 00-C-7222, 2003 WL 22232963 (N.D. Ill. Sept. 26, 2003).

Following discovery, the defendants moved for summary judgment and, on September 26, 2003, the district court granted the defendant's motion in its entirety. Specifically, the trial judge concluded that Evans could not prevail on his malicious prosecution claim because he could not establish that the circumstances surrounding the *nolle prosequi* of the May 12, 1997 charge and the withdrawal of the violation of probation charge were "consistent with his innocence." *Id.* at *18-20. In addition, as to Evans' First Amendment civil rights claims and his state law intentional infliction of emotional distress claims, the court found that because the alleged illegal acts took place in 1997, and that suit was not filed until 2000, they were both well beyond the two-year statute of limitations for First Amendment civil rights claims in the State of Illinois, *see Kelly v. City of Chicago*, 4 F.3d 509, 511 (7th Cir. 1993), and the applicable one-year statute of limitations for tort claims against governmental employees in Illinois, *see* 745 ILCS 10/8-101. *Id.* at *15-17, *22-23. Finally, the district judge concluded that Evans' RICO claims must also fail as a matter of law, due to the fact that he lacked standing to bring that claim because he had failed to establish that he had been injured in his "business or property by reason of a violation of Section 1962" within the meaning of 18 U.S.C. § 1964(c). *Id.* at *10-14. Judgment was entered in favor of the City of Chicago and the officers, and Evans timely appealed.

## II. ANALYSIS

We review the district court's grant of summary judgment in favor of the City and the individual officers *de novo*, *See Stark v. PPM America, Inc.*, 354 F.3d 666, 670 (7th Cir. 2004), and view the record in the light most favorable to the non-moving party, here Evans. *See Dunn v. Nordstrom, Inc.*, 260 F.3d 778, 783 (7th Cir. 2001). Summary judgment is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact presents a "genuine issue" if it is "one on which a reasonable factfinder could find for the nonmoving party." *Hottenroth v. Village of Slinger*, 388 F.3d 1015, 1027 (7th Cir. 2004) (quoting *Patel v. Allstate Ins. Co.*, 105 F.3d 365, 370 (7th Cir. 1997)). An issue of fact is "material" if it is outcome determinative. *Id.* However, "bare allegations not supported by specific facts are not sufficient in opposing a motion for summary judgment." *Id.* (quoting *Hildebrandt v. Ill. Dept. of Natural Res.*, 347 F.3d 1014, 1036 (7th Cir. 2003)).

### A. Issues

On appeal, Evans challenges only the district court's grant of summary judgment as to his RICO, First Amendment, § 1983 claims and his state law tort claim for intentional infliction of emotional distress. In doing so, Evans argues that the loss of income and attorneys fees that he incurred was the direct and proximate result of the defendant-appellees RICO violations, thus providing him with standing to sue pursuant to 18 U.S.C. § 1964. Evans also argues that his First Amendment civil rights claims and his state law tort claims are not barred by the applicable statutes of limitation because he was the victim

of a continuing tort, *see, e.g.*, *Hyon Waste Management Services, Inc. v. City of Chicago*, 214 Ill.App.3d 757, 762-763 (Ill. App. Ct. 1991), which did not cease until the year 2000, when his civil case was filed.

*1. RICO Standing*

The civil RICO statute, 18 U.S.C. § 1964(c), provides that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue . . . in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee." § 1964(c). The phrase "injured in business or property" has been interpreted as a standing requirement—rather than an element of the cause of action—which must be satisfied in order to prevail on a RICO claim. *See Gagan v. American Cablevision, Inc.*, 77 F.3d 951, 958-59 (7th Cir. 1996). The causation component of § 1964(c)—whether an alleged RICO injury was caused "by reason of" a violation of the statute—has also been considered a component of standing. *See, e.g., Beck v. Prupis*, 529 U.S. 494 (2000); *Lerner v. Fleet Bank*, 318 F.3d 113, 123 (2d Cir. 2003). As such, the issue "represents a jurisdictional requirement which remains open to review at all stages of the litigation." *Id.* (quoting *National Organization for Women, Inc. v. Scheidler*, 510 U.S. 249, 255 (1994)).

a. Injury to Business or Property

In order for Evans to secure standing to sue under RICO, he must first present the court with evidence that he incurred an injury to his "business or property" within the meaning of § 1964. *Gagan*, 77 F.3d at 959. Evans claims he has done this in two ways. First, he claims that because he was the target of an illegal campaign to persecute and

harass by Chicago Police Officers, he was wrongly "targeted for prosecution" and unjustifiably imprisoned. As a result, he argues that he was damaged in his "business or property" by being falsely imprisoned—even though he pled guilty to and was convicted of some of the charges—because he lost potential income during that period of time.[19] Also, Evans claims that because he was wrongfully targeted for prosecution and illegally imprisoned, he was forced to incur attorneys fees to defend himself in the resulting criminal actions constituting an injury to his "business or property." We disagree.

Although the RICO statute is to be construed broadly, and we are charged with liberally construing the law to "effectuate its remedial purpose," *Sedima S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 498 (1985), not every injury is cognizable under § 1964. *See Doe v. Roe*, 958 F.2d 763, 768 (7th Cir. 1992). Indeed, in *Sedima*, the Supreme Court quoted with approval this Court's admonition that "[a] defendant who violates section 1962 is not liable for treble damages to everyone he might have injured by other conduct, nor is the defendant liable to those who have not been injured." *Sedima*, S.P.R.L., 473 U.S. at 496-97 (quoting *Haroco, Inc. v. American National Bank & Trust Co. of Chicago*, 747 F.2d 384, 398 (1984)). Building on this concept, this court has determined that "[t]he terms 'business or property' are, of course, words of limitation which preclude recovery for personal injuries and the pecuniary losses incurred therefrom." *Doe v. Roe*, 958 F.2d at 767. *See Schiffles v. Kemper Financial Servs., Inc.*, 978 F.2d 344, 353 (7th Cir. 1992), *abrogated on other grounds by Beck*, 529 U.S. at 495-507 (citing *Berg v. First State Ins. Co.*, 915 F.2d 460, 464 (9th Cir. 1990)); *see also Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979) (analyzing an

---

[19] As discussed *infra*, Evans had been unemployed for three years prior to his imprisonment.

identical phrase in the Clayton Act); *Rylewicz v. Beaton Servs.*, 888 F.2d 1175, 1180 (7th Cir. 1989).

This seems quite proper when one considers that personal injuries lie outside the "business or property" standing provision of the Clayton Act, *see* 15 U.S.C. § 15, which is identical to the standing requirement contained in the civil RICO statute.[20] Indeed, in *Reiter v. Sonotone Corp.*, the Supreme Court directly addressed the question of whether the Clayton Act's standing provision, which like civil RICO requires injury to "business or property," encompassed personal injuries. *See Reiter*, 442 U.S. at 339. The Court stated that although actual monetary losses would, under most circumstances, be sufficient to confer

---

[20] The Clayton Act provides that "any person who shall be *injured in his business or property* by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States." 15 U.S.C. § 15(a) (emphasis added). As the Supreme Court acknowledged: "Even a cursory comparison of the two statutes reveals that the civil action provision of RICO was patterned after the Clayton Act." *Agency Holding Corp. v. Malley-Duff & Associates, Inc.*, 483 U.S. 143, 150 (1987); compare 15 U.S.C. § 15(a) and 18 U.S.C. § 1964(c). During Congressional debates over the civil RICO statute, the American Bar Association recommended that the bill be amended "to include a provision authorizing private damage suits based upon the concept of Section 4 of the Clayton Act." 116 Cong. Rec. 25190-25191 (1970). The reason for this is that prior to the introduction of the "business or property" standing requirement, the civil RICO bill did "not do the whole job . . . [i]t [made] the mistake of merely authorizing such suits, without resolving the many and varied procedural questions which [would] arise in its application, and without granting to the courts the full extent of remedial authority contained in comparable antitrust laws." 116 Cong. Rec. 35227 (1970) (remarks of Rep. Steiger). Accordingly, the Clayton Act's standing requirement was introduced by amendment into the bill in order to enhance the "clarity and contours of the title's procedural provisions." *Id.*

standing under the Clayton Act, "Congress must have intended to exclude some class of injuries by the phrase 'business or property,'" and the Act "would, for example, exclude personal injuries suffered." *Id.*

Relying on the Supreme Court's decision in *Reiter*, this court has gone on to hold, not only that personal injuries do not provide standing in civil RICO actions, *see Rylewicz*, 888 F.2d at 1180, but also that pecuniary losses flowing from those personal injuries are insufficient to confer standing under § 1964(c). *Roe*, 958 F.2d at 767. In the civil RICO context, personal injuries which may result in pecuniary losses, but are nonetheless insufficient to provide standing under § 1964(c) have been found to include injury to mental health or emotional distress; *see Genty v. Resolution Trust Corp.*, 937 F.2d 899, 918 (3d Cir. 1991); sickness, poisoning and emotional distress, *Drake v. B.F. Goodrich Co.*, 782 F.2d 638, 643-44 (6th Cir. 1986); emotional distress due to loss of security and peace, *Berg v. First State Ins. Co.*, 915 F.2d 460, 464 (9th Cir. 1990); injury stemming from the harassment and intimidation of federal witnesses, *Rylewicz*, 888 F.2d at 1180; loss of income due to wrongful death of a family member/source of support, *Gorogan v. Platt*, 835 F.2d 844, 846-47 (11th Cir. 1988), and inability to pursue or obtain meaningful employment, *id.*

Applying the concept that personal injuries and attendant pecuniary losses flowing from those injuries do not satisfy the standing requirements of § 1964,we now turn to Evans' claims.

*i. Loss of Employment Income*

Evans initially claims—most creatively we must admit but nevertheless without merit—that he has established RICO standing as evinced by his loss of income during the

period of time while he was lawfully and properly incarcerated because he was unable to seek or obtain gainful employment. The crux of Evans' argument is that, due to the fact that he was allegedly maliciously prosecuted and falsely imprisoned, he thus lost the ability to pursue gainful employment and also lost potential income from that employment. As such, his claim must fail.[21]

The loss of income as a result of being unable to pursue employment opportunities while allegedly falsely imprisoned[22]—similar to monetary losses flowing from the loss of consortium, loss of security and peace, wrongful death and similar claims sounding in tort—are quintessentially pecuniary losses derivative of personal injuries arising under tort law. *See,* e.g., *Doe,* 958 F.2d at 770. Under Illinois law, which in this instance defines the scope of tort law, both malicious prosecution and false imprisonment constitute traditional tort claims which

---

[21] We note that, while this case is before this court on summary judgment and all facts must be taken in the light most favorable to Evans, the record suggests that Evans was lawfully incarcerated at all times pertinent to this suit.

[22] Because Evans' complaint was dismissed on summary judgment, we view the evidence in the light most favorable to him. *See Hottenroth,* 388 F.3d at 1026. However, it is worth noting that Evans' claim that he was falsely imprisoned borders on the absurd. There is no dispute that Evans was found guilty to one charge of possession of a controlled substance and pled no contest to another. Therefore, even if we were to find that loss of potential employment income provided standing pursuant to 18 U.S.C. § 1964(c), Evans' claim would fail the "but for" causation test enumerated by the Supreme Court in *Holmes v. Sec. Investor Prot. Corp.,* 503 U.S. 258, 268 (1992). This is due to the fact that Evans would be unable to establish that "but for" the acts of the officers he would have been able to gain employment, because he was lawfully imprisoned at the time he alleges he suffered those injuries.

result in a personal injury. *See Swick v. Liautaud*, 169 Ill.2d 504, 512 (Ill. 1996) (malicious prosecution); *Cruthis v. Firstar Bank, N.A.*, 354 Ill.App.3d 1122, 1136 (Ill. App. Ct. 2004) (false imprisonment). These torts often result in personal injuries, such as those enumerated above, including the inability to pursue or obtain gainful employment. Evans' claim of loss of employment income is nothing more than an indirect, or secondary effect, of the personal injuries that he allegedly suffered, the inability to seek or obtain employment, and therefore such a claim does not constitute a cognizable injury to "business or property" within the meaning of § 1964(c). *Doe*, 958 F.2d at 770 (holding that "Doe's loss of earnings . . . are plainly derivatives of her emotional distress—and therefore reflect personal injuries which are not compensable under RICO") (citing *Rylewicz*, 888 F.2d at 1180).

To illustrate the point that personal injuries and incidental monetary losses flowing from them do not confer § 1964(c) standing further, it is helpful to employ an analogous situation. In the oft-cited case, *Grogan v. Platt*, the Eleventh Circuit held that the plaintiffs had failed to establish RICO standing by pleading economic loss and loss of employment income related to the wrongful death of their loved ones. *See Grogan*, 835 F.2d at 846-47. The *Grogan* court concluded that "pecuniary losses are so fundamentally a part of personal injuries that they should be considered something other than injury to 'business or property.'" *Id.* at 847. Like the plaintiffs in *Grogan*, Evans has failed to allege anything more than pecuniary losses antecedent to a personal injury. The fact that *Grogan* was premised on a tort claim of wrongful death and Evans' case is premised on false imprisonment and malicious prosecution is of no import. The real question is whether Congress intended RICO laws to compensate plaintiffs for pecuniary losses, such as loss of income, stemming from what is essentially a personal injury like

the inability to work or seek employment. We are of the opinion that Congress did not intend to do so. *See infra* p. 24 n.21. This is particularly true given the "restrictive significance" of the RICO standing requirement, which was adopted directly from the Clayton Act. *See Reiter*, 442 U.S. at 339; *see also infra*, p. 20 n.23. Indeed, we are inclined to agree with the United States District Court for the District of Columbia's statement in *Morrison v. Syntex Labs.* that "[h]ad Congress intended to create a federal treble damages remedy for cases involving bodily injury, injury to reputation, mental or emotional anguish, or the like, all of which will cause some financial loss, it could have enacted a statute referring to injury generally, without any restrictive language." 101 F.R.D. 743, 744 (D.D.C. 1984), cited with approval in *Grogan*, 835 F.3d at 847 (citation omitted) (emphasis in original).

In *Doe v. Roe*, this court held that the loss of income resulting from the personal injury of emotional distress was not sufficient to establish standing under § 1964(c). 958 F.2d at 765-67. In doing so, we noted that "[m]ost personal injuries—loss of earnings, loss of consortium, loss of guidance, mental anguish, and pain and suffering, to name a few—will entail some pecuniary consequences." *Id.* at 770. However, we concluded that although "the economic aspects of such injuries could, as a theoretical matter, be viewed as injuries to 'business or property,' . . . engaging in such metaphysical speculation is a task best left to philosophers, not the federal judiciary." *Id.* Likewise, although the economic aspects of Evans' alleged loss of employment income injury could conceivably be regarded as affecting "business or property," Congress specifically foreclosed this possibility by adopting the civil RICO standing requirement and its "restrictive significance" from the Clayton Act. *See Reiter*, 442 U.S. at 339, *see also infra* p. 20 n.23.

This is not to say that a plaintiff may *never* recover under RICO for loss of an employment opportunity. Where

an employee is able to establish that he has been unlawfully deprived of a property right in promised or contracted for wages, the courts have been amenable to classifying the loss of those wages as injury to "business or property." *See,* e.g., *Williams v. Mohawk, Industries, Inc.*, 411 F.3d 1252, 1260 (7th Cir. 2005). However, Evans does not claim that he was engaged in a lawful business enterprise or activity which was interfered with by the City or the officers who allegedly harassed him. *Cf. Rosario v. Livaditis,* 963 F.2d 1013, 1020-21 (7th Cir. 1992). In addition, he does not claim that he was discharged from his employment as the result of his refusal to participate in a racketeering scheme. *Cf. Shearin v. E.F. Hutton Group, Inc.*, 885 F.2d 1162-63 (3d Cir. 1989). Indeed, Evans only claims that he was effectively prevented from "seek[ing] temporary day labor work." Personal injuries such as these are most decidedly not the type of injury that the RICO laws were designed to address.[23]

---

[23] The RICO laws were developed as "an aggressive initiative to supplement old remedies and develop new methods for fighting crime." *Sedima,* 473 U.S. at 498. The United States Congress envisioned a set of laws that would facilitate the "irradication of organized crime in the United States, by strengthening the legal tools in the evidence-gathering process, by establishing new penal prohibitions and by providing enhanced sanctions and new remedies to deal with the unlawful activities of those engaged in organized crime." 116 Cong. Rec. 35216 (1970) (remarks of Rep. Donohue). It is unlikely that the legislature would have had the foresight to see the law being utilized in an action against a municipality or its police officers; however, the law was "aimed at keeping organized crime out of legitimate businesses" as well as illegitimate criminal enterprises. *Id.* at 35200; *see also United States v. Turkette,* 452 U.S. 576, 587 (1981) (holding that the civil RICO statute applies to criminal as well as legitimate enterprises).

(continued...)

Thus, our holding is limited to plaintiffs such as Evans, whose claims of injury are framed in terms of pecuniary

---

[23] (...continued)

Also, as the Supreme Court recognized in *Sedima*, "RICO is to be read broadly. This is the lesson not only of Congress' self-consciously expansive language and overall approach, but also of its express admonition that RICO is to 'be liberally construed to effectuate its remedial purposes.'" *Sedima*, 473 U.S. at 497-98 (quoting Pub. L. 91-452, § 904(a), 84 Stat. 947.) (internal quotations and citations omitted). However, it would be contrary to the intent of Congress for this court to construe the statute *so broadly* that we completely read the "restrictive significance," *see Reiter*, 442 U.S. at 339, of the "business or property" standing requirement out of 18 U.S.C. § 1964(c). As illustrated above, the provision incorporated into § 1964(c) was adopted directly and expressly from § 4 of the Clayton Act, 15 U.S.C. § 15. *See supra* p. 18-19 n.19.

Congressional lawmakers well understood that adopting the Clayton Act's standing requirement would magnify the "clarity and [reinforce the] contours of the title's procedural provisions." 116 Cong. Rec. 35227 (remarks of Rep. Steiger). The denouement—whether good or bad—of increased "clarity" in this instance was the adaptation of the Clayton Act's standing requirement that a prospective plaintiff be injured in his "business or property" and the "restrictive significance" that those words retain. *See Reiter*, 442 U.S. 339. Although Congress may have been concerned with "a private litigant [who] would have to contend with a body of precedent . . . setting strict requirements on questions such as 'standing to sue' and 'proximate cause,'" that is exactly what was inherited by incorporating the Clayton Act's standing requirement. *Sedima*, 473 U.S. at 498 (quoting 115 Cong. Rec. 6995 (1969)). While this consequence may have been unintended, we are bound by the words of the statute, which exclude personal injuries as grounds for standing under the civil RICO statute. *See Reiter*, 442 U.S. 339. Expanding the class of injuries sufficient to confer standing under the statute is a job best left up to the United States Congress, not the federal courts.

losses incurred as a result of what can only properly be classified as a personal injury—such as the inability to seek or obtain employment opportunities arising out of false imprisonment or malicious prosecution tort claims. *See Grogan*, 835 F.2d at 847.

Our conclusion is bolstered by the fact that Illinois law also does not recognize the right to seek out employment opportunities as a cognizable property right. Often, courts will look to state law to determine the meaning of a "property" right pursuant to federal statutes such as RICO. *See Doe*, 958 F.2d at 768 ("While federal law governs most issues under RICO, whether a particular interest amounts to property is quintessentially a question of state law."). This has indeed proved to be an acceptable and appropriate method for determining the meaning that should be given to property interests. *See Ledford v. Sullivan*, 105 F.3d 354, 357 (7th Cir. 1997) (stating that "[p]roperty interests 'are not created by the constitution' . . . [r]ather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law . . . .") Pertinent here is the fact that the Illinois Supreme Court has specifically held that a person has a property interest in employment only where that person has a legitimate expectation of continued employment. *See Fumarolo v. Chicago Board of Ed.*, 142 Ill.2d 54, 107 (Ill. 1990) (holding that "a property interest in employment as a tenured teacher can be created where there is a legitimate expectation of continued employment"). In addition, under Illinois law, to state a claim for "interference with prospective economic advantage" which is essentially what Evans claims the City and the officers did by allegedly falsely imprisoning him thereby denying him the opportunity to seek or obtain gainful employment, "a plaintiff must allege (1) a reasonable expectancy of entering into a valid business relationship, (2) the defendant's

knowledge of the expectancy, (3) an intentional and unjustified interference by the defendant that induced or caused a breach or termination of the expectancy, and (4) damage to the plaintiff resulting from the defendant's interference." *Anderson v. Vanden Dorpel*, 172 Ill.2d 399, 406-07 (Ill. 1996) (citing *Fellhauer v. City of Geneva*, 142 Ill.2d 495, 511 (1991)). Evans has proffered no evidence, much less case law that could or would lead us to conclude that, by lawfully prosecuting and imprisoning him, the City or the Officers, in any way, interfered with his "legitimate expectation of continued employment," nor has he alleged that he had a "reasonable expectancy of entering into a valid business relationship." There is no question that the State of Illinois has the right, and indeed the obligation, to arrest and incarcerate individuals that violate the State's drug laws, as Evans did by possessing a controlled substance. The fact that this precluded him from seeking employment was merely a derivative of his criminal behavior, and does not constitute the deprivation of a property right.[24] Therefore, looking to state law to define "property" in this context does not help Evans' claim, for he is still unable to establish that he was injured in his "business or property" based on the fact that he was denied the opportunity to seek work while incarcerated.[25]

---

[24] Indeed, aside from conclusory allegations of police misconduct, Evans does not offer any evidence that he was either falsely imprisoned or maliciously prosecuted. Also, it is undisputed that the convictions the State gained against Evans in Cook County Circuit Court are valid and have not been overturned. *See supra* p. 7-9. As such, Evans' claim that he was somehow denied a property interest by being incarcerated borders on the ridiculous.

[25] It should be noted, however, that we need not adopt a state law definition of "business or property" which is so broad that it contravenes Congress' intent in enacting the RICO law. *See*
(continued...)

Accordingly, we reaffirm our holding in *Doe v. Roe*, and in doing so reiterate this court's understanding that personal injuries, and the pecuniary losses flowing from those injuries, are insufficient to establish standing under the civil RICO, § 1964(c).[26] We also hold that foregone

---

[25] (...continued)
*Reconstruction Finance Corp. v. Beaver County*, 328 U.S. 204, 208 (1946) (holding that federal courts are justified disregarding state law if the Congressional purposes underlying federal law would be undermined).

[26] We are cognizant of the fact that our decision today is at odds with that of the United States Court of Appeals for the Ninth Circuit in *Diaz v. Gates*, 420 F.3d 897 (9th Cir. 2005) (en banc). The *Diaz* majority, however, blurs the distinction between whether an alleged injury satisfies the statutory definition of "business or property" and whether a "business or property" injury was proximately caused by a predicate RICO act. This is evinced by the court's statement that: "Diaz suffered two types of injuries: (1) the personal injury of false imprisonment and (2) the property injury of interference with current or prospective contractual relations. Treating the two as separate, and denying recovery for the first but letting the suit go forward on the second, is both analytically cleaner and truer to the language of the statute." *Id.* at 902. This analysis is equal parts mischaracterization of the RICO statute and red herring. For one thing, in the *Diaz* case, false imprisonment would not be a "personal injury," as the Ninth Circuit characterized it; instead, it would be a cause of action in tort, which would give rise to a personal injury such as loss of employment, loss of consortium, etc. *See*, e.g., *Guaranty Nat. Ins. Co. v. International Ins. Co.*, 994 F.2d 1280, 1285 (7th Cir. 1993). Also, simply because a personal injury—in Diaz's case "interference with current or prospective contractual relations"—entails some pecuniary consequence, does not mean that RICO standing has been established, for it is part and parcel of the underlying personal injury, i.e., it flows from it. *See id.* And as the Supreme Court has made clear, the phrase (continued...)

earnings stemming from the lost opportunity to seek or gain employment are, as a matter of law, insufficient to satisfy § 1964(c)'s injury to "business or property" requirement where they constitute nothing more than pecuniary losses flowing from what is, at base, a personal injury. *See Doe*, 958 F.2d at 770. Thus, because Evans' claims of

---

[26] (...continued)
" 'business or property' . . . exclude[s] personal injuries suffered." *Reiter*, 442 U.S. at 339. Diaz's loss of employment and the related monetary losses he suffered merely represent pecuniary losses derivative of a underlying, non-compensable personal injury, and as such those losses cannot constitute an independent grounds for RICO standing. *See id.*; *Roe*, 958 F.2d at 770.

In addition, the Ninth Circuit's decision seems to weigh significantly on that court's understanding of what constitutes a "property interest" pursuant to California law. For example, court concluded that the loss of income stemming from the inability to pursue employment did constitute a cognizable injury sufficient to establish standing under RICO, concluding that Diaz had "alleged both [a] property interest and [a] financial loss," under California law. *Diaz*, 420 F.3d at 900. The court stated that the "harms [Diaz] allege[d] amount[ed] to intentional interference with contract and interference with *prospective business relations*, both of which are established torts under California law." *Id.* (emphasis added). In doing so the court stated that the distinction between current and prospective employment was "untenable" due to the fact that "California law protects the legal entitlement to both current and prospective contractual relations." *Id.* However, as discussed above, Illinois law does no such thing. In fact, Illinois law explicitly protects only the "legitimate expectation of continued employment," *See Fumarolo*, 142 Ill.2d at 107, or a "reasonable expectancy of entering into a valid business relationship," *Anderson*, 172 Ill.2d at 406-07, none of which apply to Evans. Therefore, because the *Diaz* decision is neither controlling law nor persuasive in its rationale, we need not alter our opinion today in light of that decision.

loss of earnings due to the inability to seek out or obtain employment constitute pecuniary losses stemming from personal injury, he lacks standing under RICO to advance this portion of his claim and the district court did not err in granting the defendant's motion for summary judgment.

ii. Attorney's fees

Evans also claims that he suffered monetary losses sufficient to establish standing under § 1964(c), in the form of attorney's fees, when he was forced to defend himself against the charges levied by the Illinois State's Attorney. Specifically, Evans argues that the fees he incurred to defend against the withdrawn violation of probation charge and the May 12, 1997 possession of a controlled substance charge constitute a cognizable RICO injury. We disagree.

As discussed at length above, personal injuries and the pecuniary losses stemming therefrom do not establish standing under the civil RICO statute. *See Roe*, 958 F.2d at 770. Like pecuniary losses stemming from the inability to seek or gain employment due to a plaintiff's alleged false imprisonment, pecuniary losses which emanate from a personal injury such as the acquisition of attorney fees due to alleged malicious prosecution or false imprisonment do not provide a plaintiff with standing under the civil RICO statute. In *Doe v. Roe*, we addressed precisely this issue and held that monies expended in retaining a "new attorney [were] plainly derivatives of her emotional distress—and therefore reflect personal injuries which are not compensable under RICO." *Id.* The fees that Evans allegedly paid his attorney with regard to the withdrawn violation of probation charge and the May 12, 1997 possession of a controlled substance charge which was *nolled*, are clearly derivative of his alleged false imprisonment and malicious prosecution claims and

therefore represent non-compensable pecuniary losses related to personal injuries. *See Swick v. Liautaud*, 169 Ill.2d at 512 (describing the elements of a tort claim for malicious prosecution). As such, they are also insufficient to supply him with standing under RICO.

However, even if we were to assume *arguendo* that Evans had established a "business or property" injury within the meaning of § 1964(c) of the RICO statute, he has failed to prove that his payment of attorney's fees was proximately caused by the alleged racketeering activity undertaken by the city.

The Supreme Court, in *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992), analogized § 1964(c) to § 4 of the Clayton Act, and concluded that a defendant's RICO violation, in addition to being the "but for" cause of a plaintiff's injuries, must also be the "proximate" cause. In doing so, the Court outlined a number of reasons why a direct relationship between an injury and an alleged RICO violation is so important, stating that "[a]lthough . . . directness of relationship is not the sole requirement of Clayton Act causation, it has been one of its central elements." *Id.* at 269 (citing *Associated General Contractors of Cal., Inc. v. Carpenters*, 459 U.S. 519, 540 (1983)).

In line with the Supreme Court's guidance in *Holmes* and previous decision such as *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 497 (1985), which states that "[a]ny recoverable damages occurring by reason of a violation of §1962(c) will flow from the commission of predicate acts," a number of appellate courts have held that a showing of RICO injury requires proof of a "concrete financial loss" and does not encompass mere "injury to a valuable intangible property interest." *See, e.g., Anderson v. Kutak, Rock & Campbell*, 51 F.3d 518, 523 (5th Cir. 1995) (quoting *Steele v. Hospital Corp. of Am.*, 36 F.3d 69, 71 (9th Cir. 1994)). Indeed, every court that has addressed this issue has

held that injuries proffered by plaintiffs in order to confer RICO standing must be "concrete and actual," as opposed to speculative and amorphous. *See*, e.g., *Regions Bank v. J.R. Oil Co., LLC*, 387 F.3d 721, 728 (8th Cir. 2004); *Steele*, 36 F.3d 69, 70; *Anderson v. Lincoln Insurance Agency, Inc.*, 2003 WL 291928, at *3 (N.D.Ill. Feb. 10, 2003); *Pelfresne v. Village of Rosemont*, 22 F.Supp.2d 756, 765 (N.D.Ill. 1998). Recently, this court adopted a similar standard, holding that "a cause of action does not accrue under RICO until the amount of damages becomes clear and definite." *Motorola Credit Corp. v. Uzan*, 322 F.3d 130, 135 (2d Cir. 2003).

Evans claims that, due to the alleged racketeering activities of the named police officer defendants, he was forced to incur additional attorney's fees to defend against charges on which he was later vindicated. In addition, Evans claims that he incurred fees for "many court sessions where witness after witness was put on to testify about harassing incidents involving the defendants." However, even when viewed in the light most favorable to Evans, the evidence concerning the attorney's fees is far too speculative to confer RICO standing.

The problem is that Evans was convicted of two of those charges, i.e., the June 8, 1997 possession of a controlled substance charge and the June 14, 1997 possession of a controlled substance charge, while the other two charges (the violation of parole charge and the May 12, 1997 possession of a controlled substance charge) were abandoned. Even if we were to assume that Evans "prevailed" on the charges that were abandoned, the question remains: What portion, if any, of the attorney's fees that Evans incurred is attributable to the charges that were abandoned?

The attorneys that represented Evans tell us, via affidavit testimony, that they would have charged Evans

the same amount of money—$20,000 or $10,000 a piece—regardless of the number of charges pending against him at the time. In addition, they themselves state that they did not apportion their time amongst the criminal charges, i.e., they only kept an aggregate total of the hours worked and did not bill based on which charge they were addressing at any given time. Whether billing in such a manner constitutes a good business decision or not, we, along with the attorneys that represented Evans, are unable to discern what, if any, percentage of that $20,000 would constitute damages even if Evans were to prevail on his RICO claim. He does state in an affidavit that "[h]ad there been less than four cases, I would have incurred less than a $10,000 debt to attorney Alexander." However, Evans offers no other support for this statement and, as this court has repeatedly held, the self-serving affidavit of a plaintiff is *ipso facto*, insufficient to create an issue of material fact. *See*, e.g., *Cichon v. Exelon Generation Co.*, 401 F.3d 803, 810-813 (7th Cir. 2005); *Laborers' Pension Fund v. RES Environmental Servs., Inc.*, 377 F.3d 735, 739 (7th Cir. 2004); *see also Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 504 (7th Cir. 2004) ("self-serving statements contained in an affidavit will not defeat a motion for summary judgment when those statements are 'without factual support in the record'") (quoting *Slowiak v. Land O'Lakes, Inc.*, 987 F.2d 1293, 1295 (7th Cir. 1993)). Indeed, speculative damage claims like Evans' are precisely the type of situation the Supreme Court was trying to avoid in *Holmes v. Securities Investor Protection Corp.*, when the court instituted a proximate cause requirement in order to establish standing in civil RICO cases. 503 U.S. 258, 269 ("the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent,

factors").[27]

Because Evans has failed to create an issue of material fact, and because his RICO claim fails as a matter of law, we conclude the district court did not err when it granted summary judgment to the defendants, finding that Evans lacks RICO standing.

---

[27] In addition, even if were able to parse the record and the affidavits in order to determine which charges were incurred with respect to certain criminal charges, Evans has not established that the attorney's fees he incurred were caused by a predicate act within the meaning of the RICO statute. *See* 18 U.S.C. §§ 1964(c), 1962; *see also Beck v. Prupis*, 529 U.S. 494, 500-07 (2000) (holding that in order for a RICO plaintiff to have standing he must establish that his injuries were caused by a predicate act within the meaning of 18 U.S.C. § 1962). In order to establish standing, Evans must point to an illegal act enumerated in 18 U.S.C. § 1962, that was the proximate cause of his alleged injuries, which he has failed to do. *See id.* There is no indication in the record whatsoever that Evans was mistakenly or incorrectly arrested or charged with the offenses that were later abandoned, i.e., violation of parole and possession of a controlled substance on May 12, 1997. As mentioned above, the May 12 charge was abandoned as part of a pre-arranged plea agreement with Evans and his counsel. *See supra* p. 11-12. Also, although the violation of probation charge was abandoned, even viewing the record in the light most favorable to Evans, as we must at this stage, there is nothing to suggest that Evans had not violated his parole and was correctly charged with this offense. As the state's attorney trying Evans' cases stated in affidavit testimony, he moved to have the violation of probation charge resolved as "probation terminated unsatisfactory" because Evans had served the maximum amount of time for his 1996 conviction while awaiting trial and the prosecutor believed the charge to be "moot." *See supra* p. 11.

2. First Amendment and Intentional Infliction of Emotional Distress Claims

Evans also claims that the district court erred in granting summary judgment to the defendants on his First Amendment civil rights and state law intentional infliction of emotional distress claims. Evans argues his First Amendment, § 1983 claim and his intentional infliction of emotional distress claims should not be considered time barred "because (1) suit was filed within one year of the termination of the criminal prosecutions . . . and (2) both claims involve a continuing tort, where a repeated course of tortious conduct continued even after the filing of the suit." Evans is mistaken.

The statute of limitations applicable to claims under 42 U.S.C. § 1983 in Illinois is the same two-year provision which governs personal injury actions in the state, 735 ILCS 5/13-202. *Williams v. Lampe*, 399 F.3d 867, 869-70 (7th Cir. 2005) (citing *Hileman v. Maze*, 367 F.3d 694, 696 (7th Cir. 2004)). The limitations period for tort claims, such as intentional infliction of emotional distress, against governmental entities and their employees, however, is only one year pursuant to 745 ILCS 10/8-101. *See id.* It is undisputed that the vast majority of events giving rise to Evans' complaint took place in 1997. It is also undisputed that Evans did not file his suit until 2001. Therefore, unless he is able to identify some legal rationale for us to extend the statute of limitations or conclude that acts giving rise to his claim continued for a substantial amount of time following the incidents in 1997, his claim must fail.

Evans' initial argument is that the cause of action did not accrue until the termination of the state criminal proceedings against him in 2000. What Evans fails to take into consideration is that the default rule, under Illinois law, is that "a cause of action for personal injuries accrues

when the plaintiff suffers injury."[28] *Golla v. General Motors Corp.*, 167 Ill.2d 353, 360 (Ill. 1995) (citing *West American Ins. Co. v. Sal E. Lobianco & Son Co.*, 69 Ill.2d 126, 130 (Ill. 1977), and *Hermitage Corp. v. Contractors Adjustment Co.*, 166 Ill.2d 72 (Ill. 1995)). In addition, as the district court correctly found, nothing in either federal law or Illinois law tolls or delays the running of an applicable statute of limitations on a § 1983 claim until criminal proceedings are concluded. See *Pitts v. City of Kankakee*, 267 F.3d 592, 595 (7th Cir. 2001) (stating that "[n]ormally, the statute begins to run from the date of an injury" on a § 1983 claims); *Kelley v. Myler*, 149 F.3d 641, 645 (7th Cir. 1998); *see also Day v. Morgenthau*, 909 F.2d 75, 79 (2d Cir. 1990). Thus, both Evans' § 1983 claims and his intentional infliction of emotional distress claims are barred, unless the "doctrine of continuing violation" applies. *See Heard v. Sheahan*, 253 F.3d 316, 319 (7th Cir. 2001).

The doctrine of continuing violation, as the Illinois Supreme Court has held, "does not involve tolling the statute of limitations because of delayed or continuing injuries, but instead involves viewing the defendant's conduct as a continuous whole for prescriptive purposes." *Feltmeier v. Feltmeier*, 207 Ill.2d 263, 279 (Ill. 2003) (citing *Pavlik v. Kornhaber*, 326 Ill.App.3d 731, 745 (Ill. App. Ct.

---

[28] Because Evans has not alleged that he did not discover the existence of an injury until after the injury actually took place, the Illinois default rule on this subject controls. *See Golla*, 167 Ill.2d at 360 ("To alleviate the harsh consequences that would flow from the literal application of the limitations period, the judiciary created the 'discovery rule.' The effect of the discovery rule . . . is to postpone the commencement of the relevant statute of limitations until the injured plaintiff knows or reasonably should know that he has been injured and that his injury was wrongfully caused." (internal citations omitted)).

1991)). Indeed, the in *Feltmeier v. Feltmeier,* the Illinois Supreme Court made clear that "the statute of limitations is only held in abeyance until the date of the last injury suffered or when the tortious acts cease." *Id.* at 284.

Applying this common-sense rule to the facts concerning Evans' allegations of continuing torts and First Amendment violations, we are convinced that the district court correctly granted summary judgment in the defendants' favor. It is undisputed that the last, confirmed interaction between Evans and the police officers named in the complaint[29] took place sometime in December of 1997. Thus, the last injury Evans suffered, and indeed the last possible date of a tortious act against Evans, was in December of 1997, well beyond both the two-year statute of limitations for § 1983 claims and the one-year statute of limitations for tort claims against governmental entities or employees. In order to subvert this result, Evans introduced an affidavit statement claiming that in March of 2000, after he had been released from prison, two unidentified persons told a friend of Evans' that officers would be "coming around looking for him." However, this quite obvious attempt by Evans to manipulate the doctrine of continuing violations is woefully insufficient to survive summary judgment. As stated above, the self-serving affidavit statement of a plaintiff is *ipso facto,* insufficient to create an issue of material fact. *See,* e.g., *Cichon,* 401 F.3d at 810-813; *Laborers' Pension Fund,* 377 F.3d at 739; *Buie,* 366 F.3d at 504.

Thus, because the statute of limitations began running in late December 1997 and Evans didn't file suit until three years later, in November of 2000, both Evans' § 1983 claim and his state law intentional infliction of emotional

---

[29] Aside from court appearances at which the officers appeared.

distress claim were properly dismissed as being beyond the respective two and one year statutes of limitation.

## III. CONCLUSION

The decision of the district court is

AFFIRMED.

A true Copy:

Teste:

*Clerk of the United States Court of Appeals for the Seventh Circuit*